The Commonwealth of Pennsylvania ex rel. The Bell
Telephone Company of Philadelphia, *v.* Charles F.
Warwick, Mayor of the City of Philadelphia, Frank M.
Riter, Director of Public Safety, and David R. Walker,
Chief of the Electrical Bureau of said City, Appellants.

*Municipalities—Ordinances—Telephone companies.*

Where a city authorizes a telephone company to run and maintain its
wires over and through the streets of the city upon the single condition
that it shall comply with all the ordinances then existing, or thereafter
passed, "regulating or in any manner controlling telegraph or telephone
companies in the use of the streets for telegraph and telephone purposes,"
the determination of what streets shall be used is for the company, and
after it has accepted the obligation and constructed its lines, the city can-
not impose other conditions upon its grant of consent, but its authority
thereafter is only that of regulation as to the manner of using the streets.

A grant of authority by a city to a telephone company to run and main-
tain wires "over and through" the streets does not include permission to
lay the wires under, below or beneath the streets.

Where a city, in granting to a telephone company the right to use the
streets, retains the authority to regulate the manner of occupation, it may,
from time to time, compel the telephone company to adopt all reasonable
and generally accepted improvements which tend to decrease the obstruc-
tion of the streets, or increase the safety or convenience of the public in
their use.

On a petition by a telephone company for a mandamus against the mayor
and director of public safety of the city of Philadelphia to compel them
to grant permits for the erection of certain terminal poles, it appeared
that in 1879, the city, by an ordinance, authorized the company to run and
maintain its wires over and through the streets of the city, the only con-
dition imposed being that the company should enter into a written obliga-
tion to comply with all the ordinances then existing, or thereafter passed
"regulating or in any manner controlling telegraph or telephone com-
panies in the use of the streets for telegraph and telephone purposes." The
company accepted the obligation and constructed its line. In 1882, the city
by ordinance directed the removal of all poles and wires from the streets, and
the company in compliance with the ordinance placed its wires in under-
ground conduits. It found, however, that it was necessary to use certain
terminal poles which were larger than the ordinary poles, and more ob-
structive of the streets. Special permission was given for the location of
conduits and the construction of terminal poles, either by ordinance, or by
licenses from the department of public safety. In 1897, an ordinance was
passed forbidding the departments of public works and safety from issu-
ing any more such licenses, unless the same were duly authorized by ordi-

nance. Thereafter the director of public safety refused to issue any further licenses. The city in its answer to the petition averred that there was another system which dispensed with the use of terminal poles. *Held*, (1) that, under the ordinance of 1879, the telephone company had the right to determine what streets it should occupy with underground conduits, and that later ordinances giving special permission to construct such conduits were unnecessary, and, except so far as they were regulative, were inoperative; (2) that the ordinance of 1897 was invalid, as it was an attempt to interfere with an administrative power lodged in the executive department; (3) that the averment in the answer of the city as to the existence of a better system than that of the terminal poles raised a question of fact which the city was entitled to have tried before a mandamus should issue.

Argued Jan. 19, 1898. Appeal, No. 320, Jan. T., 1897, by defendants, from order of C. P. No. 4, Phila. Co., March T., 1897, No. 375, awarding mandamus. Before GREEN, WILLIAMS, McCOLLUM, MITCHELL and DEAN, JJ. Reversed.

Petition for mandamus.

The petition was as follows:

1. That in the year 1879 petitioner was incorporated under the provisions of the act of assembly of the state of Pennsylvania, of April 29, 1874, and its supplements, for the purpose of "constructing, maintaining and operating a line or lines of telegraph, and all such other business as may be authorized by the act of April 29, 1874, providing for the incorporation and regulation of certain corporations, and its supplements relating to the uses of electricity."

2. That by the thirty-third section of said act of April 29, 1874, it is provided: "Such corporation shall be authorized, when incorporated, as hereinbefore provided, to construct lines of telegraph along and upon any of the public roads, streets, lanes or highways, or across any of the waters within the limits of this state, by the erection of the necessary fixtures, including posts, piers or abutments for sustaining the cords or wires of such lines, but the same shall not be so constructed as to incommode the public use of said roads, streets or highways, or injuriously interrupt the navigation of said waters; and this a tt shall not be so construed as to authorize the construction of a bridge across any of the waters of this state."

3. That by an ordinance of the city of Philadelphia which

went into effect December 24, 1879, it was enacted by the select and common councils as follows:

## "AN ORDINANCE.

" To authorize the Bell Telephone Company of Philadelphia to run its wires through and over the streets of the city of Philadelphia.

" SECTION 1. The select and common councils of the city of Philadelphia do ordain, That the Bell Telephone Company of Philadelphia be, and is, hereby authorized to run and maintain its wires over and through the streets of the city of Philadelphia for the purpose of establishing telephonic communication between its patrons and between its exchange office and the subscribers thereto: Provided, That the consent of the owners of any private properties to which attachments are made be first had and obtained.

"SEC. 2. That before availing itself of the privileges of this ordinance the said Bell Telephone Company shall execute and deliver to the city of Philadelphia a good and sufficient bond in the sum of ten thousand (10,000) dollars, conditioned that in the event of its going out of existence by merger, or by surrender or forfeiture of its charter, it will remove the wires run by it, and further, that it will not sell the rights hereby granted to any other corporation.

" Provided, That the said Bell Telephone Company shall, before erecting any wires, as provided herein, file in the law department a written obligation to comply with all the ordinances of the city regulating or in any manner controlling telegraph or telephone companies in the use of the streets for telegraph and telephone purposes, which have been, or may hereafter be enacted, as well as the provisions of this ordinance: And provided further, That the sum of fifty (50) dollars be first paid to the city treasurer to pay for the printing of this ordinance."

4. That petitioner did execute and deliver to the city of Philadelphia a bond in accordance with section second of said last-mentioned ordinance, and did file in the law department the written obligation provided for in said section, and did pay to the city treasurer the sum of fifty (50) dollars in said section stipulated to be paid, and has in all other things complied with all the conditions and provisions of said ordinance.

5. That in pursuance of its said charter, and with the express permission and assent of the city of Philadelphia, as set forth in said recited ordinance, petitioner established telephone service by means of wires throughout the city of Philadelphia, and has, from that time to the present, furnished public telephone service by means of electricity over telegraph wires throughout the entire city. That the construction of this telegraph line required the erection on the streets of the city of many telegraph poles, and the stringing of many miles of telegraph wire.

6. By an ordinance of the city of Philadelphia, approved June 13, 1882, the councils of said city enacted as follows:

### "AN ORDINANCE.

"To remove and prohibit the erection of poles and wires for telegraph, telephone and electric light purposes.

"SECTION 1. The select and common councils of the city of Philadelphia do ordain, that, prior to the first day of January, 1885, all poles and wires erected for telegraph, telephone and electric light purposes by firms, corporations or persons other than the city of Philadelphia shall be removed from the streets of the city of Philadelphia.

"SEC. 2. That it shall be unlawful after the above date to erect or maintain any poles and wires for the above-mentioned purposes in the streets of the city of Philadelphia, excepting as provided in section 1, so far as the same relates to the city of Philadelphia.

"SEC. 3. That any corporation or person or persons, excepting the city of Philadelphia, erecting and maintaining any poles and wires for the above purposes in violation of the provisions of this ordinance shall forfeit fifty (50) dollars for every day each of said poles are maintained, to be recovered as like penalties are now recoverable by law."

7. Said ordinance of 1882 imposed upon petitioner, if it complied with its provisions, an enormous expense, and involved the practical destruction of lines of overhead wires, erected at very great expense under the authority of its charter, an authority which had been recognized by the councils of the city of Philadelphia in its ordinance of 1879, already referred to. Notwithstanding this, your petitioner, desiring to aid the municipal authorities as far as possible in what the latter considered to be

an improvement to the city, commenced at once the construction of numerous expensive underground conduits designed to eventually substitute for the overhead wires a system of underground wires.

8. It was found, both by your petitioner and all other telegraph companies within the limits of Philadelphia, impossible to complete the system of underground conduits within the limits of the time fixed by the ordinance of 1882. Although councils, by a resolution of June 11, 1885, instructed the chief of the electrical department to notify the various telegraph companies to remove the overhead wires, they subsequently, by another resolution passed January 21, 1886, instructed the chief of the electrical bureau to suspend action in the matter of cutting the wires until further action was taken by councils. In the meanwhile your petitioner has been diligently extending its underground conduits, and has now a system of conduits throughout nearly the whole of the closely built-up portion of the city of Philadelphia.

9. Under the overhead system which had been established by your petitioner under the authority of the charter, the wires are strung from pole to pole along and over instead of under the streets. By the underground system the wires are run through conduits underneath the streets, but in order to connect with the various subscribers in a reasonable way and by a reasonable, feasible expenditure, it is necessary at certain points to erect terminal poles. The number of these terminal poles is insignificant in comparison with the number of poles required by the overhead system, but their erection is necessary in order to complete the underground system and allow service to be made to the customers of your petitioner.

10. By the preamble and first section of an ordinance of the city of Philadelphia, approved January 6, 1881, it was provided as follows:

"AN ORDINANCE.

"To regulate the erection and maintenance of telegraph poles in the corporate limits of the city of Philadelphia.

"Whereas, Great inconvenience and annoyance have been occasioned to property owners by the placing of telegraph poles in front of their premises.

"And whereas, The lives and property of citizens traveling upon the public streets and highways have been imperiled by the erection and maintenance of inadequate or unsound telegraph poles thereon, so that it has become necessary to establish a system for the proper inspection of such poles, and for the regulation of the erection and maintenance thereof, therefore, ·

"SECTION 1. The select and common councils of the city of Philadelphia do ordain, That whenever permission shall have been granted by councils to any corporation, firm or individual to construct a line of telegraph which requires the erection of poles in or upon any of the public streets or highways within the corporate limits of the city of Philadelphia, it shall be the duty of such corporation, firm or individual, before any pole shall be erected, to submit to the superintendent of the police and fire-alarm telegraph a written application specifying the number and size of poles intended to be erected, and designating the places where the same are intended to be inserted, and if no objection be made hereto it shall be the duty of the said superintendent of police and fire-alarm telegraph to issue a license to the said applicant for the erection of the specified poles at the designated places of insertion. In case of objections being made to the whole or any part of such application, it shall be the duty of the superintendent of the police and fire-alarm telegraph to hear the same and grant the license, either in accordance with the application or with such conditions and modifications, to secure the purposes of this ordinance, as the case may require.

· "No pole shall be newly erected without the license of the superintendent of the police and fire-alarm telegraph shall have been previously obtained therefor as provided in this section, and for every license so granted there shall be paid to the city treasurer for the use of the city, the sum of five dollars per pole."

11. Under the reorganization of the departments of the city of Philadelphia, in accordance with the provisions of the act of assembly, approved June 1, 1885, commonly known as the Bullitt bill, the duties of the superintendent of the police and fire-alarm telegraph have been vested in the director of public safety, who exercises his control over telegraph lines, under

the ordinance of 1881, already quoted, through a subordinate officer, known as the chief of the electrical bureau of Philadelphia.

12. In the work of changing this overhead system to an underground system, in accordance with the ordinance of 1882, already cited, your petitioner has erected a large number of terminal poles, and by means thereof has been enabled to do away with many of the old poles required for the overhead system, and with many miles of overhead wires. As the construction of the underground conduits progressed permits have been given to your petitioner, from time to time, by the mayor of the city, through the director of public safety and the chief of the electrical bureau, for the erection of the necessary terminal poles. Permits have also been given, by ordinances of councils and otherwise, to other companies beside your petitioner, for the erection of similar terminal poles in connection with underground conduits, and many of them have been erected within the city limits.

13. Since the erection of the last terminal poles for which permits were issued to your petitioner as aforesaid, a large amount of additional underground conduits have been constructed by your petitioner, and for the purpose of using them and of doing away with the corresponding overhead system, in accordance with the ordinance of 1882 already referred to, it is necessary to erect additional terminal poles. Petitioner has made application to the mayor of the city of Philadelphia, the director of public safety and the chief of the electrical bureau for permission to erect said additional terminal poles. A list of the poles necessary in order to utilize the underground conduits already constructed, and for which permits have been asked for as aforesaid, is hereto annexed.

14. Petitioner has offered to pay all license fees required for said poles by any ordinances, and has fully complied with all the conditions required by the ordinances herein recited, and all lawful rules, regulations and conditions which the said mayor, director of public safety and chief of the electrical bureau might lawfully impose under said ordinances.

15. Nevertheless, the said defendants, the mayor of the city of Philadelphia, the director of public safety and the chief of the electrical bureau, refuse to issue any permits whatever to your petitioner for the erection of said terminal poles.

16. Your petitioner is without remedy at law in the premises. In its endeavor. to comply with the desires of the city of Philadelphia to change its overhead system to an underground system, it has expended a large amount of money in the construction of the underground conduits aforesaid, and in changing its plant from an overhead system to an underground system in the more densely populated portion of the city. It has now progressed a very great way in the work of such change, and the refusal to issue permits for the additional terminal poles as aforesaid leaves it with a partially completed underground system and a partially destroyed overhead system which the city claims the right to wholly destroy at any time under the ordinance of 1882, thereby threatening destruction of petitioner's plant and interference with its business. The system of terminal poles in connection with underground conduits is the system authorized to be used in Philadelphia by all other telephone companies which have put their wires underground, and is at present the ordinary and approved system within the densely built-up portion of the city for giving telephone service. It is the only way in which petitioner can reasonably and properly utilize its system of underground conduits which have been built.

Petitioner therefore prays the court to issue to Charles F. Warwick, mayor of the city of Philadelphia, Frank M. Riter, director of public safety, and David R. Walker, chief of the electrical bureau, a writ of alternative mandamus, returnable        days after service thereof, commanding the said Charles F. Warwick, mayor of the city of Philadelphia, Frank M. Riter, director of public safety, and David R. Walker, chief of the electrical bureau, to grant to your petitioner permits for the erection of the terminal poles set forth in the exhibit annexed to this petition, or to show cause why they should not do so.

Frank M. Riter, director of the department of public safety, made return as follows :

1. He admits the facts set forth in paragraphs 1, 2 and 3.

2. It is true as stated in paragraph 4 of said petition that the petitioner did execute and deliver to the city of Philadelphia a bond in accordance with the second section of the ordinance of December 24, 1879, and did file in the law department the obligation therein referred to, and did pay to the city treasurer the sum of $50.00 as required by the said ordinance. But, not-

withstanding the petitioner filed the said obligation in the law department " to comply with all the ordinances of the city regulating or in any manner controlling telegraph or telephone companies in the use of the streets for telegraph and telephone purposes which have been or may hereafter be enacted," the petitioner, the Bell Telephone Company, did not comply with the ordinance of June 13, 1882, as set forth in paragraph 6 of its petition.

3. This respondent admits the facts set forth in paragraph 5 of the said petition, but avers that the petitioner's line of telegraph is not now constructed as required by section 33 of the act of April 29, 1874, under which it was incorporated and which requires that it " shall not be so constructed as to incommode the public use of said roads, streets or highways." That since the incorporation of the said company, petitioner, a system of underground construction has been perfected which avoids the serious inconvenience and danger to the city and the public resulting from overhead construction through the streets, and that the petitioner is legally bound to construct its lines in such manner as will cause the least inconvenience and danger, and this it has not done.

4. It is true as stated in paragraph 6 that the councils of the city of Philadelphia passed the ordinance of June 13, 1882, as set forth in said paragraph, but this respondent avers that the petitioner did not comply with the provisions of the said ordinance, and did not remove its wires from the streets of the city prior to the first day of January, 1885, and that petitioner has in violation of section 2 of the said ordinance continued to erect and maintain its wires in the streets of the city, without interruption, from the date of its incorporation to the present time.

5. This respondent avers that while it is true as stated in paragraph 7 that petitioner has constructed numerous underground conduits, it is on the other hand true that it still has extensive overhead construction upon the streets of Philadelphia, and is continuing to erect such construction to the inconvenience and danger of the city and the public.

6. This respondent denies that, as stated in paragraph 8 of the petition, it was impossible for the petitioner to comply with the ordinance of June 13, 1882, but admits that councils did

pass the resolutions referred to in paragraph 8, and that the petitioner has an extensive system of underground conduits in the central part of the city.

7. This respondent denies that, as stated in paragraph 9, the erection of terminal poles is necessary in order to complete the underground system and allow service to be made to the customers of the petitioner. While the erection of terminal poles saves labor and expense in construction, they are not necessary to the completion of the underground system. This respondent further avers that while it may be true that the number of terminal poles alleged to be necessary as part of the underground system is small as compared with the number required by the overhead system, it is nevertheless a fact that the said terminal poles are larger, more unsightly and more objectionable in every way than the pole used in overhead construction. The said terminal poles are necessarily erected to a height exceeding that of the surrounding buildings, and are from eighteen to twenty-two inches in diameter.

8. This respondent admits the facts set forth in paragraphs 10 and 11.

9. This respondent admits the facts set forth in paragraph 12, but avers that no permits for the erection of terminal poles have been issued except by express authority of an ordinance of councils.

10. This respondent admits that certain underground conduits have been constructed by the petitioner since the erection of the last terminal poles, as set forth in paragraph 13 of the petition, but denies that, as stated in said paragraph, " it is necessary to erect additional terminal poles."

It is true that the petitioner has made application, as stated in paragraph 13, for permission to erect additional terminal poles, and that the list annexed to the said petition marked " A " is a correct list of poles for which permits have been asked, but respondent avers that even if permits could be granted by these respondents for the erection of terminal poles along petitioner's line, the poles ought to be located by the electrical bureau, with a view to the interests of the city and of the property owners, as well as the convenience of the public, and not by the petitioner.

11. The respondent avers that, even if the allegations con-

tained in paragraph 14 of the petition be true, he nevertheless cannot lawfully issue a permit for the erection of any poles in the city of Philadelphia without authority of councils, and that councils have not authorized the issuing of any such permit.

12. The respondent admits the fact stated in paragraph 15 of the petition, but avers that he is without authority of law to issue permits for the erection of the said terminal poles.

13. This respondent denies that his refusal to issue permits for terminal poles will cause the destruction of petitioner's plant, as stated in paragraph 16 of the petition. This respondent denies, as stated in paragraph 16, that the system of terminal poles in connection with underground conduits is the system authorized to be used in Philadelphia by all other telephone companies which have put their wires underground, and avers that the only other telephone company which has placed its wires underground in Philadelphia is the American Telephone and Telegraph (Long Distance) Company, and that company does not use the system of terminal poles, but uses another system which could also be used by this petitioner, the Bell Telephone Company.

14. This respondent, for a further return, avers that by the ordinance of April 18, 1863, the erection of any pole or poles in the streets of the city is prohibited, unless authorized by councils, and that this prohibition was emphasized by the ordinance of June 13, 1882, which, although suspended in operation so far as the removal of existing poles and wires was concerned, has never been repealed as to the erection of additional poles and wires. This view of the present status of the ordinance of 1882 is confirmed by the ordinance of July 13, 1890, granting the Bell Telephone Company the privilege of extending its poles and wires in Germantown, and which expressly repealed so much of the ordinance of June 13, 1882, as conflicted therewith. This respondent further avers that the ordinance of August 5, 1886, regulating the laying and construction of underground wires, electrical conductors, conduits, etc., in the city of Philadelphia requires the consent of councils for all such construction, and that councils have never authorized the erection of the terminal poles, as a part of such underground system for which permits are demanded by the petitioner. This respondent further avers that by the ordinance of Janu-

ary 12, 1888, the Bell Telephone Company was authorized to lay and maintain underground conduits, cables, etc., and to erect terminal poles within certain portions of the city of Philadelphia; that in accordance therewith the petitioner has constructed underground conduits, etc., and has erected about two hundred terminal poles; that the said ordinance of 1888 contained a proviso that the privileges granted therein should " cease and determine unless one third of the entire construction authorized by this ordinance is completed within two years; two thirds within three years, and the entire construction within five years after the passage of this ordinance; " that the said five years expired on January 12, 1893, since which time the petitioner has been without authority to erect the said terminal poles, and is now without such authority, and that this respondent has no authority to issue permits for the erection of such poles.

15. The said respondent further avers that the select and common councils of the said city of Philadelphia, on February 4, 1897, passed the following resolution:

"RESOLUTION.

"Relative to issuing permits for the constructions of conduits and the erection of terminal poles.

"Resolved, by the select and common councils of the city of Philadelphia, that the departments of public works and safety, and board of highway supervisors, are hereby directed not to issue any permits for the construction of underground service or the erection of terminal poles unless the same has been duly authorized by ordinance of councils."

The court in an opinion by AUDENRIED, J., awarded a mandamus.

*Error assigned* was the order of the court.

*James Alcorn*, assistant city solicitor, with him *John L. Kinsey*, city solicitor, for appellants.—The course of dealing of the parties is evidence of their understanding of the meaning of the ordinance. · This is so in the construction of contracts, as in Gas Co. v. Wire Co., 155 Pa. 22, and in the interpretation of statutes, as in Commonwealth v. Mann, 168 Pa. 290. As the ordinance of 1879 was a grant of power to the Bell Tele-

phone Company, it should, as in the case of a charter, be strictly construed as against the grantee and in favor of the grantor.  It should receive such construction as to authorize only the privileges clearly and expressly given.  Nothing is to be taken by implication against the public, except what necessarily flows from the nature and terms of the grant: Mayor v. R. R., 26 Pa. 355; Tiedeman on Municipal Corporations, sec. 302.

The use of underground conduits and terminal poles in connection therewith is a different method of operation from that authorized by the ordinance of 1879.  It contemplates another use of the highways.

Even if the underground system be the modern method of operation, that would not entitle petitioners to construct and use underground conduits under a license to maintain overhead wires.  It may be that the use of underground wires would be to the benefit of the public and the company's customers, but that would not justify a construction which would enlarge its franchise: People v. Newton, 112 N. Y. 396; King v. Ward, 4 Adol. & El. 384; Davis v. Mayor, 14 N. Y. 525; Reeves v. Traction Co., 152 Pa. 153; Potter v. Scranton Traction Co., 176 Pa. 271.

The right of the city under its general powers to so regulate companies using the highways, and particularly telegraph or telephone companies, was determined in W. U. Tel. Co. v. City, 22 W. N. C. 39, Allentown v. W. U. Tel. Co., 148 Pa. 117, Chester v. Tel. Co., 154 Pa. 464, Phila. v. Tel. Co., 167 Pa. 406 and Allegheny City v. People's Gas Co., 172 Pa. 632.

*John G. Johnson*, for appellee.—The question in this litigation is not whether the appellee is bound to comply with all reasonable regulations imposed upon telegraph and telephone companies, in the use of its streets, by the city of Philadelphia, but whether having once been conceded the right, by ordinance of councils, to use said streets for the purpose of its incorporation, it can now be denied the right so to use them, although ready to comply with all existing regulations, until it shall obtain further consent of councils.

The matter of a right of a corporation under a privilege to it granted to avail itself of all appliances subsequently discovered

and introduced into common use, arose under the construction by the trolley companies of poles and wires which differed in the widest possible way from the original operation by horses. The grant of the general power was held to include that of the miner: Lockhart v. Craig St. Ry. Co., 139 Pa. 419; Rafferty v. Cent. Traction Co., 29 W. N. C. 542; Halsey v. Ry. Co., 20 Atl. Rep. 859; Williams v. Ry. Co., 41 Fed. Rep. 556; Briggs v. R. R. Co., 79 Me. 363; Taggart v. Newport St. Ry. Co., 7 Rwy. & Corp. L. J. 385.

The city of Philadelphia, very properly, in granting the appellee the right to exercise its franchise within the city limits, reserved to itself the right to legislate by general ordinances in the way of such regulation and control. It seems almost absurd for it to claim, because of the reservation of the right to pass ordinances regulating and controlling companies in the use of the streets, that its councils reserved to themselves the right to revoke or to annul at any time in the future the right conceded. Such annulling does result, if the city can forbid the exercise of a right which it has conceded, by a new ordinance prohibiting what was originally and without reservation conceded: Mayor v. Thorne, 7 Paige, 261.

The appellee by its charter is authorized to lay wires and erect poles in connection therewith along and through the streets of the city of Philadelphia. The consent of the city of Philadelphia to this erection was given by an ordinance in which it reserved to itself no right to withdraw its concession, but simply to pass general ordinances to which telegraph and telephone companies were to be subject, regulating their use of the streets. No such ordinance so regulating or controlling the use of the streets, saving that of 1881, was ever passed. The ordinances of the city subsequently to 1881 have all been directed to the taking away from the appellee of its right to lay wires over or under the streets, and to the compelling it to obtain a new assent to the laying of each additional wire, subject to whatever terms councils may see fit to impose. The mandamus was proper which compelled the officials of the city in whom are now vested the rights and duties connected with this particular subject-matter, by virtue of the ordinance of 1881, and to abandon their refusal to permit any wires to be laid until a special ordinance of councils so permitting had been passed, and which directed

them to perform their duty of passing upon the question of the propriety of location, and of granting permission to erect, if the poles and wires were unobjectionable in construction and location.

OPINION BY MR. JUSTICE MITCHELL, May 2, 1898:

The Bell Telephone Company, relator, claims the right under the ordinance of 1879 granting permission to introduce its system into Philadelphia, to lay its wires under the streets, and to erect such terminal poles, etc., as it may deem necessary, subject only to the regulation of the use of the streets by general ordinances of councils. The respondents on the other hand, on behalf of the city of Philadelphia, contend that the consent of councils must be specially obtained for each extension of the relator's conduits or wires and the erection of each terminal pole. Neither of these opposing contentions can be sustained in its entirety. The basis of the relator's rights is the ordinance of December 24, 1879, by which it was "authorized to run and maintain its wires over and through the streets of the city of Philadelphia for the purpose of establishing telephonic communication between its patrons and between its exchange office and the subscribers thereto." Except certain preliminaries which were complied with, the only condition imposed by this ordinance was that the company should enter into a written obligation to comply with all the ordinances then existing or thereafter passed "regulating or in any manner controlling telegraph or telephone companies in the use of the streets for telegraph and telephone purposes." The relator having accepted this obligation and constructed its lines, it is clear that the power of the city to impose conditions upon its grant of consent was ended. Its authority thereafter was only that of regulation as to the use of the streets.

The grant however of authority to run and maintain wires "over and through" the streets, did not include permission to lay them under, below or beneath. Over and through are equivalent to across and along, not only by the natural meaning of the words in this connection, but by the practical construction given to them at the time by the acts of the parties. The claims of the relator in this respect are too broad and cannot be sustained.

But by the ordinance of June 13, 1882, the relator, in common with all others except the city of Philadelphia itself, was directed to remove all poles and wires from the streets prior to January, 1885, and prohibited from erecting any others after that date. The object of this ordinance is admitted to have been the substitution of the underground for the overhead system. No question was raised by the telephone company as to the reasonableness of this ordinance as a regulation of the use of the streets, and it proceeded to construct and put in operation in a considerable part of the city its underground conduits and wires. By the concurrent act therefore of the city and the company, the mode of using the streets in the exercise of the latter's franchise has been changed from the overhead to the underground system. No other change was made, and the franchise remains the same in all other respects. The original grant of consent extended to all the streets of the city. There was no limitation then and there could be none imposed thereafter.

The change to the new system was not made all at once, and the city, by ordinances from time to time, postponed the date for the removal of the poles, and finally suspended the operation of the ordinance of 1882 in that respect till further action of councils. Nor was it found practicable apparently by the telephone company to do away altogether with the use of poles, and in adopting its underground conduits it has used what have been called in this case terminal poles, which though much fewer in number than the old telegraph poles are much larger and more obstructive of the street. Permission for the location and construction of conduits and the erection of such poles has from time to time been granted by special ordinance on application to councils, and licenses from the superintendent of the police and fire-alarm telegraph, and later from the department of public safety. Question having been made however as to the issuance of such licenses the mayor was of opinion that he might do so, but in January, 1897, he submitted the matter to councils recommending the passage of a resolution giving express authority to the director of public safety. Councils however on February 4, 1897, passed instead, a resolution directing the "departments of public works and safety . . . . not to issue any permits for the construction of underground service

or the erection of terminal poles unless the same has been duly authorized by ordinance of councils." Thereafter the director of public safety, deeming himself without power, refused to issue any further licenses, and hence the filing of this petition by the telephone company.

The ordinance of 1879, as already discussed, put no restriction on the streets or localities to be occupied by the telephone company, nor did the ordinance of 1882. The latter authorized, and in fact commanded, the replacement of the overhead by the underground system, and in so doing it necessarily authorized the construction of conduits, terminal poles or any such appliances as are or may be reasonably necessary to make the system effective. And the determination as to what streets should be occupied was no longer in councils but in the telephone company, except possibly so far as any particular street might be so exceptionally situated as to take it out of the general rule. The ordinance therefore of January 12, 1888, and others of the like kind, granting permission to lay conduits in certain streets, were unnecessary, and, except so far as the provisions as to the manner of doing the work, at night, etc., may be valid regulations, were inoperative.

While the city, however, has parted with its power to designate the streets to be occupied, it has expressly retained the authority to regulate the manner of occupation. And this includes the power to compel the adoption from time to time of all reasonable and generally accepted improvements which tend to decrease the obstruction of the streets or increase the safety or convenience of the public in their use. By the ordinance of January 6, 1881, "to regulate the erection and maintenance of telegraph poles" in the city of Philadelphia, any corporation or person authorized to erect telegraph poles was required to obtain a license from the superintendent of the police and fire-alarm telegraph, who was authorized to receive the applications, hear objections and grant the license, with such conditions, etc., as the case should require to secure the purposes of the ordinance. Under the Bullitt bill of 1885 the duties and authority of the superintendent of the police and fire-alarm telegraph passed to the department of public safety, which is now vested with the authority to issue licenses for telegraph poles, etc., under the ordinance of 1881, and with the general supervision

of the subject. The power being administrative in its nature and lodged in an executive department cannot be controlled by councils under the prohibition of the Act of 1885, article 16, P. L. 54. The resolution of February 4, 1897, was therefore beyond the province of councils and of no effect.

The judgment of the learned court below was in substantial accord with the principles so far discussed, but overlooked one point of at least technical importance. The case was heard on petition and answer, and the averments of the latter must be taken to be true. In paragraph seven it is denied that terminal poles are a necessary part of the operation of the underground system; in paragraph ten it is averred that the poles, if licensed at all, should be located by the electrical bureau, with a view to the interests of the city and the property owners and the convenience of the public, and in paragraph thirteen it is averred that there is another system which dispenses with terminal poles already in use by another company, and which could be used by the relator. These averments raise questions of fact which the respondents are entitled to have determined before the issue of a peremptory mandamus. The ordinance of 1881 requires the applicant for license to designate the places where the poles are to be erected, but gives the department authority to revise and modify the particulars before issuing the license. We presume this is all that is meant to be claimed by paragraph ten of the answer, and if so, it is clearly within the province of the department. The other matters, if insisted upon, may be more serious. As already said, the power of regulation includes the power to compel the adoption of reasonable and generally accepted devices which increase the safety and convenience of the public. The use of terminal poles being the system heretofore adopted, the burden of showing that there is a better one, in general acceptance and reasonably adoptable by the telephone company, will be upon the city. Whether the director of public safety, in view of the expression in his letter of December 10, 1896, to the mayor, that "in fact with underground conduits terminal poles are alone practicable," will be disposed to insist now on a different system is for him to determine. The matter is largely within his discretion, and now that he is freed from the prohibition of the resolution of February 4, 1897, and restored to his proper control of the subject, we presume he

can readily come to an agreement with the relator.    But for the present the answer must stand as raising an issue of fact which must be disposed of before final judgment.

Judgment reversed and procedendo awarded.