## Pa. Electric Co. v. City of Erie

*Quinn, Leemhuis, Plate & Dwyer*, for appellant.
*Gerald J. Weber*, City Solicitor, for appellee.

EVANS, P. J., February 6, 1959.—This matter is before the court on an appeal for review of the Ordinance of the City of Erie No. 143, 1957, and seeking an order of court declaring said ordinance to be an abuse of authority and an unreasonable assertion of police power.

From the pleadings and the testimony we make the following:

*Findings of Fact*

1. Plaintiff is a corporation which by virtue of its charter rights and Public Utilities Commission authority furnishes electric current to users of that commodity in the City of Erie.

2. Defendant is a municipal corporation functioning under the Third Class City Code and has by ordinances granted plaintiff the right to use Erie city streets for the purpose of distributing electric current to users of that commodity in said city.

3. Defendant by ordinance 38—1953 authorized appellant to construct aerial 110 KV (110,000 volts) lines on the city streets subject to certain controls and directions delegated to the city electrican.

4. The city electrican approved the construction of the Washington Avenue 110 KV line on August 1, 1957.

5. Defendant by ordinance 143—1957, dated December 3, 1957, required all public utility corporations,

etc., using or occupying public highways, streets, alleys and ways in the City of Erie to place all electric power transmission lines having capacities in excess of 50,000 volts in underground conduits in areas zoned residential under zoning ordinance of the City of Erie and providing for regulation of construction and maintenance of same and establishing penalties for violation of the same.

6. At the time of the passage of said ordinance 143, 1957, plaintiff had completed 80 to 90 percent of a 110,000 volts line on Washington Avenue, Erie, at a cost of $70,000. On December 19, 1957, said line was energized and is now in use. . . .

### Discussion

The legal aspects in the litigation before us present no serious problems. It is conceded that, within reason, a municipality in the interest of public safety, health, welfare and convenience can require that electric, telephone and telegraph utilities place their wires underground.

Clause 50 of section 2403 of the Third Class City Code of June 23, 1931, P. L. 932, as amended, 53 PS §37403 empowers council ". . . to define a reasonable district within which all electric wires . . . shall be placed underground in conduits . . .". Thereafter, it is provided that the court of quarter sessions upon appeal of any person may review an ordinance passed pursuant to the above recited authority and may annul such ordinance if deemed unreasonable, capricious or arbitrary.

A company accepting a franchise that involves the use of public streets of a city or other municipality must accept it subject to the continuous right of such municipality to perform its strictly legal functions and obligations. Such municipality may not divest itself of the governmental or police powers which it holds in trust for the public and, therefore, any action taken by

the municipality which falls within the proper scope of these powers is valid whether or not it contravenes the terms of a prior grant or contract. The only limitation of such power and responsibility is that its assertion must be reasonable, and what is "reasonable" is determined under the particular facts in each case.

"When the action of a Legislature is within the scope of its power, fairly debatable questions as to its reasonableness, wisdom and propriety are not for the determination of the courts, but for the legislative body on which rests the duty and responsibility of decision . . . it would therefore appear that there is a heavy burden resting on the appellant in order to obtain a reversal". Bell Telephone Co. of Pa.'s Appeal 138 Pa. Superior Ct. 527.

We have examined all of the decisions of our appellate courts presented to us as well as those of many other jurisdictions, and find no disagreement as to these fundamental principles. See Commonwealth v. Warwick, 185 Pa. 623; American T. & T. v. Millcreek, 195 Pa. 643; Duquesne Light Co. v. City of Pittsburgh, 251 Pa. 557; Oil City v. Postal Telegraph Cable Co., 68 Pa. Superior Ct. 77; Appeal of Bell Telephone Co. of Pennsylvania, 138 Pa. Superior Ct. 527.

Text books on municipal government including Dillon and McQuillin support our conclusion that the law of other States is similar to that in Pennsylvania, and no case was cited by the litigants wherein a court has determined similar legislation to be unreasonable. In our own research we found one. The court in Long Island Lighting Co. v. Village of Old Brookville, 84 N. Y. S. 2d 385, stated:

". . . although a municipality may, within reason, require wires to be placed in conduits in public streets, especially in congested areas, no decision has been called to the court's attention warranting the drastic

legislation here attempted with respect to high voltage lines over private lands and in a predominantly rural area."

This case does illustrate the possibility of unreasonable exercise of power which may have prompted the legislature to permit a review by the court to determine whether or not such ordinances are reasonable or capricious and arbitrary.

There remains, therefore, for consideration only the facts in the situation before us from which to conclude whether or not defendant's ordinance no. 143 passed December 3, 1957, is reasonable and whether or not, regardless of our conclusions on that point, it may be now made effective, notwithstanding the fact that the installation complained of was 80 to 90 percent completed under the ordinance of 1953 when the ordinance of December 3, 1957, was passed.

Washington Avenue between Twenty-sixth and Thirty-eighth Streets, where the high voltage line in question is now erected, is paved and lined by private dwellings, none of which are of greater height than one and one half stories. Between Twenty-sixth and Thirty-eighth Streets, Washington Avenue is one and three quarter miles in length and in addition to the installations which are now required by the city ordinance to be placed underground, there are many other wires varying in voltage and running parallel, across and diagonally therewith. This condition is shown in detail by city's photographic exhibits A1 to A15, inclusive.

Washington Avenue is not designated as a through highway by the State of Pennsylvania, but is used to some extent by trucks and other vehicles as a short cut between such highways. McClelland Avenue, where a similar installation is planned, is greater in length, but at the present time does not have as many residences bordering thereon. However, the residents along McClelland Avenue have joined with the residents on

Washington Avenue in protest against the installed as well as the proposed construction for the reasons we will hereinafter discuss.

Plaintiff contends that this is a necessary method by which it may economically carry to two substations located in the city, bulk quantities of electric current from production sources located in Warren and Clarion. Plaintiff further plans to join these two lines along Twelfth Street, thereby completing a loop of this high tension facility over a distance in all of approximately 12 miles, nearly two thirds of which is not residential. It is contended, that the city's needs for current are growing constantly, and require the use of high power bulk transmission lines to meet the increased demands of residents and business concerns.

Testimony was submitted to show that the size and strength of all phases of the Washington Avenue installation are well in excess of the standards for safety fixed by the National Electric Safety Code, and that there is no undue hazard or inconvenience to the residents along McClelland Avenue and Washington Avenue which justifies defendant's ordinance no. 143. It was also shown that there are no narrow streets, high buildings, congested business areas, city parks, airports or hindrances of any kind to prevent efficient fire fighting such as existed in those cases where the courts in this State have previously sustained similar legislation.

On behalf of defendant, testimony was produced to show that each of the private dwellings in close proximity to the installation suffered in property value to the extent of $2,000 to $3,000 because of the unsightly appearance and dangerous condition. No testimony was offered to contradict this, and we accept this estimate as approximately correct. Experts testified that there is continuous imminent danger to people and a likelihood of fire in the nearby dwellings, if for any

reason the wires sagged so as to contact other service wires or fell to the ground or on roof tops.

Plaintiff's witness Ishler, division manager, testified: "We like to get the poles as free of traffic as we can because of the adverse conditions and experience with pole collisions or automobile collisions with poles."

Police officers testified to pole collisions in the city which have averaged about four a month over a period of years; also to the fact that when power lines fall to the ground it is difficult to protect people nearby from coming in contact with them.

We note with interest that in McManus v. Pennsylvania Electric Co., 389 Pa. 168, the Supreme Court in a per curiam opinion affirmed the opinion of President Judge Roberts (reported in 8 D. & C. 2d 303) which recites that a witness for defendant, (plaintiff here) testified: "that if there had been a contact between its high voltage and service wires there would have been a bright flame and a roar, with damage to the wires and interruption of service to customers on the same circuit as well as damage to their small electrical appliances." A garage had been burned to the ground and damages were recovered. We cite this case only as an illustration of what can happen as represented by defendant's expert witnesses.

In defendant's exhibits A1 and A15, it can be plainly seen that in case a pole breaks or is bent over from a motor vehicle striking it or if the line breaks for any reason, such contact with service wires would be almost inevitable.

Deputy Fire Chief North testified that utility poles and wires in general interfere with the operation of the big aerial trucks in case of fire. He admitted, however, that in private dwelling fires such equipment was not ordinarily used.

We do not feel that this plaintiff can, in effect, zone between four or five miles of city streets as is proposed

here to use for residential buildings of one and one half stories in height. Erie is a growing community. According to the census of 1950 this city had a population of 130,803 and according to recent estimates has grown so as to have a population in excess of 140,000. The surrounding suburban area is likewise increasing in population and it is difficult to conclude that any street in the city is not congested with traffic of trucks and other vehicles. In Appeal of Bell Telephone Co., supra, the Superior Court supported the right of a municipality having approximately 1,000 people to require the removal of wires from its one main street. Here it is evident that the population of the two streets in question does or will soon exceed the population of Eldred Borough in its entirety.

In our opinion the installation complained of is a hazard to the safety of the people not only in the vicinity of the installation but to the many people who use the streets. The effect of such installation has been to cause an unsightly appearance and more particularly to cause serious loss in property values. The cost of underground installation which was variously estimated to exceed $250,000 on Washington Avenue is a matter which must be given serious consideration, but it is more than offset by the loss in value to the property owners nearby and the hazards to these residents and all users of the streets.

We have also considered the fact that ordinance 143 was passed after the installation was nearly completed at a cost of $70,000, such installation having been made pursuant to ordinance 38 passed in the year 1953 and with the approval of the city electrician.

However, we must note that the 1953 ordinance was passed at the instance of plaintiff-company which at that time intended to erect a station at Girard and bring its high power lines into the city of Erie, 20 miles away over private lands and railroad right-of-

ways. The city electrician on August 1, 1957, may have been unthinking or even negligent, but it would seem plaintiff might more properly have again placed before council its changed plans so as to permit a review of the 1953 ordinance with reference thereto.

In any case, however, the law is as previously recited to the effect that a municipality may at any time under proper circumstances assert its governmental or police powers irrespective of the terms of a prior grant or contract.

### Conclusions of Law

1. Ordinance no. 143 passed by the Council of the City of Erie December 3, 1957, is not an arbitrary, unreasonable or capricious exercise of its police power.

2. The Plaintiff should have reasonable time to comply with the requirements of said ordinance.

3. The Plaintiff should pay the costs.

### Order

Now, February 6, 1959, it is ordered and decreed that ordinance no. 143 of the City of Erie is valid, effective and enforceable. It is further ordered and decreed that the 110,000 volts line on Washington Avenue in violation of said ordinance be removed on or before February 1, 1960. It is further ordered that plaintiff pay the costs of this proceeding.