THE MAYOR AND COMMON COUNCIL OF THE BOROUGH OF SOUTH
   AMBOY and THE BOARD OF CHOSEN FREEHOLDERS OF THE
   COUNTY OF MIDDLESEX

*v.*

THE PENNSYLVANIA RAILROAD COMPANY and THE UNITED
   NEW JERSEY RAILROAD AND CANAL COMPANY.

[Decided June 1st, 1909.]

1. Where a railroad company was required to maintain a proper
passageway under its tracks at a crossing, a bill to compel the railroad
company to enlarge such passage to provide for increased traffic, &c., must
be regarded as a bill, not to abate a nuisance in a public highway or for
the determination of easements, but as only invoking the chancery juris-
diction conferred by the General Railroad act (*P. L. 1903 p. 660 § 29*),
providing that, when a railroad company shall not properly construct and
maintain crossings of highways by its railroad tracks as required by law,
the township or municipality may proceed in equity to compel specific
performance of the duties imposed by law on the company in that
respect, &c.

2. The extent of user ordinarily determines the minimum width of a
highway ; the extent of user not being limited, however, to the track
formed by the wheels of vehicles.

3. Where the public acquires a right of travel over the land of another,
the public easement includes the use of such adjacent lands as may
be needed for ordinary repairs and improvements.

4. In order that a railroad "crossing" shall exist, the railroad and
the highway must intersect each other in some degree, or at least one
must be superimposed on the other.

5. The charter of a railroad company (*P. L. 1829-30 p. 88 § 15*) re-
quired it to construct and keep in repair good and sufficient bridges or
passages over the railroad or roads where any public or other road shall
cross the same, so that the passage of carriages, horses, and cattle on
the roads shall not be prevented thereby, &c. General Railroad act (*P.
L. 1903 p. 659 § 26*) makes it the duty of every railroad company to
construct and keep in repair sufficient passages over, under, and across
the company's right of way so that public travel shall not be impeded, &c.,
provided that section shall not enlarge the duty imposed by charter
on any railroad incorporated prior to 1873.—*Held,* that section 26 did
not enlarge the charter duties of the railroad company under which it
was not required to construct an underneath crossing to the full width
of the street, but was only required to construct a "passage" sufficiently
large for the accommodation of the existing needs of the public.

6. The legislature, in the exercise of police power, may increase the burdens on railway companies in respect to highway crossings.

7. Where a railroad was not constructed prior to April 21st, 1873, and its charter required it to construct and keep in repair sufficient bridges or passages over its railroad where any public or other road shall cross the same, the chancery court, in a statutory action authorized by the Railroad law (*P. L. 1903 p. 660 § 29*), had power to compel the company to construct a good and sufficient passage under its road for the accommodation of travel on a street with which the road had provided an inadequate undercrossing.

8. Where a railroad company's charter required it to construct good and sufficient bridges or passages "over" its railroad or roads where any public highway shall cross the same, the word "over" was used in its ordinary sense to mean "above."

9. Where a railroad company was required to construct and maintain an underpassage where a street crossed its right of way for a distance of two hundred and sixty-five feet covered by seventeen tracks, the railroad company was required to build and maintain a passage thirty-three feet wide and light the same either by suitable openings or artificial light, to pave the same to conform to the street, and to keep it properly drained.

10. Notice to a railroad company to construct and repair an underpassage or crossing is not a condition to the maintenance of a suit to compel specific performance of the company's duty to do so under Railroad law (*P. L. 1903 p. 660 § 29*), authorizing the township or municipality by suit in equity to compel specific performance of the duties imposed on the railroad company with reference thereto by law.

11. Under Railroad law (*P. L. 1903 p. 660 § 29*), authorizing the township or municipality to proceed in equity to compel specific performance of a railroad company's duty to construct and maintain proper crossings, the county was neither an improper nor unnecessary party complainant to a suit by the common council of a borough for such relief.

---

Final hearing on bill, answer and proofs taken in open court.

*Mr. Frederic M. P. Pearse* and *Mr. George S. Silzer,* for the complainants.

*Mr. Alan H. Strong,* for the defendants.

STEVENSON, V. C.

The object of the bill is to effect a change of conditions of inconvenience and danger which are alleged to exist in the borough of South Amboy at that part of the public highway known as

Ridgefield avenue, where the railroad of the defendants crosses the same. The bill purports to exhibit the statutory equitable action to compel the specific performance of the duties imposed by law upon the defendants with respect to this crossing provided by section 29 of the General Railroad act of 1903. *P. L. 1903 p. 660.*

The important physical facts which constitute the grievances which the complainants assert on behalf of the traveling public are as follows:

The defendant the Pennsylvania Railroad Company, which is operating the railroad constructed under the charter of the Camden and Amboy Company, and its predecessors in title and possession, have gradually multiplied parallel tracks extending across Ridgefield avenue until there are seventeen in number, and the section of the highway covered over by these tracks has come to measure two hundred and sixty-five feet. The Camden and Amboy charter was passed in the year 1830 (*P. L. 1830 p. 83*), so that the first track must have been constructed at some time after that date. For a period following this first construction the proofs show that a passageway over the railroad was made and maintained by the operating company, which passageway was sufficiently wide to enable two vehicles going in opposite directions to pass each other at every point. At a later period, whether after raising the grade of the track of the railway company or not does not distinctly appear, the highway was passed through the embankment of the company and under the rails of its track. The railway company thereupon, at first, perhaps by means of timber, and soon afterwards, at any rate, by means of stone walls or abutments, carried its rails over the highway. The passageway thus provided for the public seems to have been reasonably sufficient for all the purposes of travel during that early period. I do not think that it is necessary to go back of this condition which was established and apparently accepted by the traveling public about fifty years ago or more. The stone walls were fourteen feet apart, and perhaps twenty-five or thirty feet in length. They encroached upon the highway to an extent hereinafter considered. The space between the rails was not planked over. There is no indication that the passageway was

inconvenient from lack of light or adequate drainage. The character of the adjacent lands and the infrequent use of the highway probably made the passageway amply sufficient for all the purposes of travel in that day.

One ancient witness testified that vehicles did not undertake to pass each other between these walls, but that the driver of a vehicle could readily look ahead through the passageway, and if two vehicles happened to meet at the passageway, which no doubt was an infrequent occurrence, one would wait for the other. From the condition of reasonable convenience and safety above described, a steady change in the direction of inconvenience and danger has been caused by the increase of travel on the road and by the operations of the railway company in widening its embankment and adding line after line of parallel tracks. The stone walls have been extended in order to sustain these lines of rails. When the walls had attained a considerable distance it appears to have become evident to the operators of the railway that some provision must be made for permitting vehicles to pass each other in what had become a tunnel. The railway company had not only extended the walls but had laid planking between the rails so that the highway passed through a rectangular tube of which the bottom apparently was the roadbed, the sides were the parallel stone walls, and the top consisted of the girders upon which the rails were laid and the planking which closed the intervening space. A turnout, therefore, was constructed, with a row of pillars or supports in the centre, the stone walls being made to recede from each other in a curved line. The stone walls, however, at the end of the turnout were brought together to about the same distance from each other as that which separated them at the start, viz., about fourteen feet. When the last tracks at the extreme southeasterly side of the right of way of the railroad company were laid, it seemed to be recognized by the operators of the railroad that an indefinite extension of this huge dark pipe through which the highway ran would not be advisable, and accordingly the side walls were made to recede, forming a flare. Along one side of the entire passageway runs a sidewalk two feet and five inches wide, leaving only eleven feet and seven inches for the roadway for vehicles.

The grade of the highway when the railroad was constructed across it ascended toward the east from a point at or near the location of the first track or tracks. As the tracks were multiplied and the passageway or tunnel under them was extended toward the east, the grade of the highway was changed presumably because of the necessity for maintaining all the railroad tracks on substantially one plane or grade. The result was to lower the grade of the highway at least for a considerable distance under some, and probably many, of the more easterly tracks, and to make the ascent up a hill from the easterly end of the crossing more steep. There is direct testimony to this effect.

When the railroad track or tracks were first carried over the highway, it may be that the natural ancient grade of the highway was not in any way changed. It may also be that the girders or other supports upon which the rails were laid were high enough above the grade of the highway to afford sufficient headway for all sorts of vehicles which were customarily used in that locality. However this may be, the evidence, I think, establishes, beyond all question, that under the conditions which now exist and which may have been caused by the construction of these parallel railway tracks in recent times, the highway now has insufficient headway for the convenient passage of the higher kinds of vehicles.

It is unnecessary more particularly to describe the conditions at this crossing of the defendant's railway over Ridgefield avenue as they exist to-day. These conditions create a constant inconvenience and danger to the public, as has been amply proved. The passageway is so dark that the borough of South Amboy has assumed the burden of lighting the same with artificial lights. In times of heavy rains large quantities of water and sand are carried down into one of the open ends of the tunnel and render for a time the roadway impassable, there being apparently no provision for lateral drainage through the walls. After the water has sunk into the soil the sand remains obstructing the highway and the public authorities are put to expense in removing the same.

The theory of the bill is that the duty of changing these inconvenient and dangerous conditions is imposed by law upon the

defendant railway corporation, and that the court of chancery, in the exercise of the jurisdiction created by section 29 of the General Railroad act, can compel the specific performance of this duty.

It is admitted that by virtue of the consolidation which created the defendant, the United New Jersey Railroad and Canal Company, that company became charged with all the duties of the Camden and Amboy Company under its charter, and that by virtue of the lease of the United Railroad and Canal Company to the other defendant, the Pennsylvania Railroad Company, which lease was ratified by the legislature of New Jersey (*P. L. 1873 p. 1298*), the duties imposed on the United New Jersey Railroad and Canal Company with reference to the crossing of highways were charged upon the Pennsylvania Railroad Company. The lease which was thus ratified has not been put in evidence, but neither the answer nor the proofs show that the duties of the lessor company with respect to the crossing of Ridgefield avenue were transferred to the lessee company so as to relieve the lessor company therefrom. Under the pleadings and proofs the two defendants must be regarded as charged with all the duties with respect to this crossing which would be imposed upon the Camden and Amboy Company if that corporation were now operating this road under its charter.

The bill in this case, in my opinion, must be regarded as invoking only the jurisdiction conferred upon the court of chancery by section 29 of the General Railroad act. It is not a bill to have conflicting easements regulated or to have a nuisance in a public highway abated by an injunction. As the bill is framed and as the case has been tried the only proper decree in favor of the complainant must be a decree adjudging that the defendants have "not properly constructed and maintained" the "crossing" above described and directing the "specific performance of the duties imposed by law" upon the defendants "with respect to the construction, maintenance and repair" of said "crossing." Incidentally what is now a nuisance may be removed and the use of land subjected to conflicting easements may be in a measure regulated. A bill to abate a nuisance might accomplish its purpose and yet leave the most important duties of the defendants

with respect to the highway crossing entirely undefined and unenforced. A bill to regulate conflicting easements might practically create new duties and exhibit a radically different cause of action from that which is vested in a township or municipality by section 29 of the General Railroad act. I think, therefore, that we may disregard the plausible arguments of counsel for the complainants, based upon the assumption that in this case the court of chancery may exercise its jurisdiction relating to nuisances or its jurisdiction to regulate under certain conditions the use of conflicting easements. The bill of complaint most amply exhibits the statutory action created by the above-cited statute, and that statutory action affords a complete remedy for all the grievances set forth in the bill.

1. The first question to be determined relates to the nature and legal status of this public highway known as Ridgefield avenue. The proofs show that prior to the construction of the first track of the Camden and Amboy Railroad Company this highway existed leading from South Amboy in a westerly direction through a sparsely settled territory and terminating at a certain dock or docks on the Raritan river. The road now leads to a bridge which has recently been erected across the river and forms a direct line of communication between Perth Amboy and South Amboy. Many buildings have been erected on the westerly side of the railway, where formerly there were open fields and unenclosed lands. The volume of travel over Ridgefield avenue in consequence of these changes and improvements has very greatly increased.

An effort was made to show that a road was laid out in 1866, which coincided with Ridgefield avenue at this railway crossing, but I think the proof entirely failed. We have to deal with the highway as it existed by user or presumed dedication when the railroad tracks were constructed over it.

A large amount of testimony has been taken with a view to establishing the width of Ridgefield avenue. Counsel for complainants argue that the law establishes a presumption in the case of these ancient roads that they were laid out by virtue of some former statute and therefore must be deemed to be of the statutory width. The case cited to sustain this view is *Ward* v. *Folly,*

*5 N. J. Law (2 South.) 554,* decided by the supreme court through Mr. Chief-Justice Kirkpatrick, in 1819. This case apparently has only been cited once, and then in a dissenting opinion filed by Mr. Justice Valentine in *Vantilburgh* v. *Shann (1853), 24 N. J. Law (4 Zab.) 740, 748.* The statutes regulating the laying out of roads are then cited under which Ridgefield avenue might have been anciently laid out, and the insistment is made that Ridgefield avenue must be deemed to be a laid road "not more than four nor less than two rods wide."

My impression is that the peculiar doctrine laid down in *Ward* v. *Folly,* which would seem to radically alter our law in regard to the origin of highways in use for more than twenty years, has been ignored, if not practically overruled, in some reported cases, and has been utterly disregarded in large numbers of civil and criminal cases tried at the circuits. Counsel for the defendants points out that Chief-Justice Kirkpatrick based his decision upon the ground that the road in question before him was traced back to a time prior to the year 1760, when no road books were required by law to be kept in the county clerk's office. It is argued that if the doctrine of *Ward* v. *Folly* is still sound law in New Jersey, it should be strictly confined to cases where the highway is shown to have been in existence at a time when no record was required by law to be kept of the proceedings by which it was laid. There is force, I think, in this argument. Certainly in this case Ridgefield avenue was not shown to have been in existence until many years after 1760.

I am not obliged under the view that I take of this present case to ascertain and establish anything more than the minimum width of Ridgefield avenue at this place of crossing. It is safer, it seems to me, to apply to the ascertainment of the minimum width of Ridgefield avenue the rule which has generally been recognized in England and throughout the United States according to which the extent of the user determines the width. *22 Am. & Eng. Encycl. L. (2d ed.) 1224; Scheimer* v. *Price, 65 Mich. 638; Talmage* v. *Huntting, 29 N. Y. 447; People* v. *Judges, &c., 24 Wend. 491; Morse* v. *Ranno, 32 Vt. 600, 607; Savings Bank* v. *Stockwell, 84 Mich. 586; Harlow* v. *Huniston,*

*6 Cow. 189; Marchand* v. *Town of Maple Grove, 48 Minn. 271; Davis* v. *City of Clinion, 58 Iowa 389.*

The authorities agree that fences and fence lines often determine the width of a highway, but there is no proof in this case of the existence of fences defining the limits of Ridgefield avenue at this crossing-place when the railroad was constructed over sixty years ago.

The great weight of authority is opposed to the notion that the beaten track formed by the wheels of vehicles indicates the extent of the user in the case of these old country roads often called drift roads, which run through rough and unfenced lands. Vehicles pass over these roads sometimes at very long intervals. They seldom meet, but when they do meet, they may meet anywhere. The use of the road necessarily involves the passing of vehicles by each other, and the necessity for such passage may occur at any point. See *Hannum* v. *Inhabitants of Belchertown, 36 Mass. 311, 312.* When the public acquire such a right of travel and the landowners submit to the enjoyment of such right, the easement has been held to include the use of "such adjacent lands as may be needed for ordinary repairs and improvements." *Marchand* v. *Town of Maple Grove (1892), 48 Minn. 271.* The owners of lands who permit a highway to be established two or three miles or more in length must be presumed to know that at any time a change of conditions may occur such as actually happened in this case which will increase the use of the highway and multiply the number of vehicles passing hourly or daily over the same a hundred fold or more. The requirements for keeping the roadbed of Ridgefield avenue in proper condition for use today by the carriages and heavy automobiles and large furniture vans which now travel over it may be very different from the requirements of travel over the same highway seventy-five years ago, when the passage of two or three wagons per day may have measured the average use. Macadamizing the surface of the road may involve building it up and draining it by means of side ditches. The use of sufficient land on the side of the track for the purposes indicated, it seems to me, is plainly within the public easement acquired by dedication or user.

Without undertaking to discuss the mass of testimony given

by ancient witnesses and presented by documents, I have reached the conclusion that Ridgefield avenue at this place of crossing must be deemed to have been in existence when the railroad was built with a width of at least two rods. It happens by accident that a consideration of the space necessary for two large loaded vehicles to conveniently pass each other with sufficient space on each side of the roadbed to secure its maintenance in good condition, has led me to just about this figure, thirty-three feet. The finding therefore has the very great advantage of being in accordance with the argument of counsel for the complainant based upon the doctrine of *Ward* v. *Folly,* and also of being sustained by some of the authorities which support a presumption that a road whose origin is in user or dedication has the "usual width" of the roads in the same locality. *Hull* v. *Richmond, 2 Woodb. & M. 337;* *Furniss* v. *Furniss, 29 Pa. St. 15.*

It may be that a close examination of the testimony would give support to the theory that Ridgefield avenue was established by user of a greater width than thirty-three feet on the easterly side of the original railroad track where the parallel lines of the track were constructed after the year 1885. This matter, however, may be left precisely as I have left the question of the applicability of the rule laid down in *Ward* v. *Folly.* The whole of the highway or the easterly portion of it may in fact be found to have a width of forty-nine and a half feet or of fifty feet, both of which dimensions have been referred to in the argument without affecting the character of the decree to be made in this case for a reason which will hereafter appear.

2. The next question involves the ascertainment of the duties which the defendants owe to the public, "with respect to the construction, maintenance and repair" of this crossing.

.Counsel for the respective parties in this case agree that the doctrine laid down by Chancellor. McGill, I think by way of *dictum* when the case is carefully analyzed, in the case of *Raritan Township* v. *Port Reading Co., 49 N. J. Eq. (4 Dick.) 11,* applies to this case, and that the result is that when the width of the highway has been ascertained the defendants must span this entire width so as to leave the same entirely unobstructed. The view so expressed by Chancellor McGill cannot, I think, be

deemed to have received support in the reference to it made by Mr. Chief-Justice Gummere, in the case of *Borough of Metuchen* v. *Pennsylvania Railroad Co., 73 N. J. Eq. (3 Buch.) 359.* It certainly is a somewhat strange result of our law if, in case of the crossing at Metuchen, the Pennsylvania Railroad Company, in case they had built their embankment a few feet higher, would have been obliged to span the entire highway, which was sixty-six feet wide, whereas by keeping their rails a little lower and lowering the grade of the highway a span of forty-five feet was deemed adequate. If a railway crosses a highway in a deep cut fifty feet below the original level of the ground where the highway runs, the construction and maintenance of a bridge across the cut only half the width of the highway may be deemed a full performance of the statutory duty imposed upon the railway company. A railway which runs through a mountain in a tunnel does not "cross" the public roads which lie on the surface of the mountain a quarter of a mile perhaps above the railway tracks. In order to a case of "crossing" it seems to me the two things, the highway and the railroad, must intersect each other in some degree or at least one must be superimposed upon the other. In the present case the overlapping or intersection of the highway and the railroad is established beyond all doubt. The original public easement of travel over the surface of the road, as the road lay even after the first two railroad tracks had been constructed across it, has been interfered with, and to a large extent destroyed by the removal of earth and the consequent lowering of the grade of the road as track after track was constructed above and across it. If there was sufficient headway for the purposes of travel fifty or seventy-five years ago the proofs show that such is not the case to-day; that a large and high vehicle is liable to find a passage through the tunnel impossible. The natural drainage of the highway has been cut off by the extension of these apparently solid stone walls, while changes in the formation of the ground at and near the easterly end of the tunnel necessarily caused large quantities of water and sand at times to pass into the tunnel and obstruct the same. A suitable pavement for the roadbed which is reasonably necessary for the purposes of modern travel has not been supplied. Automobiles and other

heavy vehicles are left to struggle their way through the loose soil of the natural roadbed precisely as a farm wagon must have done several generations ago. The light necessary to the con- venient use of the highway has been cut off by this extraordinary extension of walls and the tracks, girders and planking extending from one wall to the other.

We are not therefore dealing with a case the facts of which bring it within the operation of the rule laid down by Chan- cellor McGill in the *Port Reading Case;* we have in hand a case which, in my judgment, in every essential feature, is precisely the same as the *Metuchen Case.* The defendants have not built and do not maintain their railroad over Ridgefield avenue "so high above the level thereof as not to interfere with the public travel thereon" (*71 N. J. Eq. (1 Buch.) 404;* they are main- taining their railroad so as to make Ridgefield avenue cross the same—so as to make railroad and road "cross" each other; they have thus *taken* a large part of what the public enjoyed in the exercise of the public easement of travel over Ridgefield avenue, and hence the statutory duty rests upon them to provide a good and sufficient "passage" as a substitute for what they have taken. The area occupied by the railroad, *i. e.,* the structure, intersects the area which is subjected to the public easement of travel over Ridgefield avenue. What the defendants are obliged to provide is not a clear span over the whole of this highway which they are crossing, but the substitute provided by law. In other words, Ridgefield avenue does not exist under these railway tracks. What exists under the tracks is a "passage" which the defend- ants have undertaken to supply in performance of their statutory duty, and this passage is not in respect of the characteristics above indicated such a good and sufficient passage as the defend- ants are by law required to construct and maintain.

Counsel for the respective parties agree that the only statute which prescribes the duties of the defendants which this suit is brought to specifically enforce is section 15 of the charter of the Camden and Amboy Railway Company, which is as follows:

"That it shall be the duty of the said company to construct and keep in repair good and sufficient bridges or passages over the said railroad or roads where any public or other road shall cross the same; so that

the passage of carriages, horses and cattle on said roads shall not be prevented thereby, and also where the said road shall intersect the farm or lands of any individual to provide and keep in repair suitable wagonways so that the owners and others may pass over the same." *P. L. 1830 p. 83 § 15.*

In my opinion, section 26 of the General Railroad act of 1903 also is applicable to this crossing and imposes duties with respect to it upon the defendants.

This section reads as follows:

"It shall be the duty of every railroad company owning, leasing or controlling any right of way for a railroad within this state, to construct and keep in repair good and sufficient bridges and passages over, under and across the railroad or right of way where any public or other road, street or avenue now or hereafter laid, shall cross the same, so that public travel on the said road shall not be impeded thereby, and said bridges and passages shall be of such width and character as shall be suitable to the locality in which the same are situated; and also where said railroad shall intersect any farm or land of any individual, to provide and keep in repair suitable and convenient wagonways over, under and across said railroad, and to construct and maintain suitable and proper cattle-guards at all road crossings; *provided,* that this section shall not enlarge the duty imposed by its charter upon any railroad company incorporated by special act and whose railroad was constructed before the second day of April, eighteen hundred and seventy-three."

It is settled law, I think, that it is competent for the legislature in the exercise of the police power of the state to increase the burdens upon railway companies in respect to highway crossings. *Morris and Essex Railroad Co.* v. *Orange, 63 N. J. Law (34 Vr.) 252; Cooley Const. Lim. (6th ed.) 714,* and cases cited; *22 Am. & Eng. Encycl. L. (2d ed.) 933, 934; 6 Am. & Eng. Encycl. L. 364.*

The law, however, contains in the proviso a limitation which counsel for the defendants claims makes the whole section inapplicable to this particular crossing. I cannot adopt this view.

In the first place, section 26 does not, in my opinion, in the slightest degree, "enlarge" the duties imposed upon the defendants by the charter of the Camden and Amboy Railroad Company. The mandate that the bridge or passage "shall be of such width and character as shall be suitable to the locality in which

the same are situated," seems to be an accurate definition of the duty in respect of bridges and passages prescribed by section 15 of the Camden·and Amboy charter. If such were not the case, however, the result would not be to render the whole section inapplicable to this case, but merely to save the defendants from being compelled to construct and keep in repair a more expensive passage under the new law than the one which they would be obliged to construct and keep in repair under the old law.

It certainly is no enlargement of the duties of the defendants to give them an option which they have under this new law to provide a good and sufficient passage for Ridgefield avenue either under, over or across their railroad, whereas under the Camden and Amboy charter, as counsel for the defendants most strenuously insists, the duty of the defendants is to maintain a suitable passage for Ridgefield avenue over this enormous barrier which the defendants have constructed and occupy with their tracks. Without undertaking to express any final opinion upon the matter, it seems to be apparent that the performance of the duty of the defendants under section 15 of the Camden and Amboy charter might require them to erect and maintain a lofty viaduct thirty or forty feet above the level of the ground on either side of the defendants' embankment and extending with suitable approaches for a distance of perhaps five or six hundred feet so as to span the entire seventeen tracks with the embankment upon which they are laid. The indications from the present volume of travel along Ridgefield avenue and the character of the defendants' use of its seventeen tracks are, that a grade crossing would be inadequate for reasons not only of convenience but safety.

In the second place, without construing the proviso of section 26 very strictly, which might be deemed proper in view of the character of this legislation, it seems clear that the railroad in its entirety was not "constructed before the second day of April, 1873." On the contrary, by far the greater part of this obstruction to travel, this "crossing" of Ridgefield avenue, was effected by the defendants when they multiplied their tracks for the purposes of their coal dumps about the year 1885 and thereafter. It is evident that it is impracticable to treat differently the por-

tion of this immense barrier which was constructed prior to 1873 from the portion which was built after that date. There cannot be a passage under one portion and over the other.

Surely, it cannot be seriously argued that section 26 enlarges the duty imposed upon the defendants with respect to the maintenance of a suitable passage at the Ridgefield avenue crossing when it gives them an option to construct such passage under their railroad, if they should deem it more convenient and less expensive to provide such passage rather than the one over their railroad prescribed by their charter. Now, the defendants having, as their counsel argues, without warrant of law, provided a passage under their railroad in lieu of the passage over their railroad which their charter prescribed, have gone on for years maintaining this passage under their railroad after it had been legalized—after the new statute had given them the option to construct and maintain this very thing in discharge of their duty.

It seems to me that the true conclusion is that this court has full power in the statutory action prescribed by section 29 to compel the defendants to construct a good and sufficient passage under their railroad for the accommodation of travel on Ridgefield avenue for reasons above indicated, viz., (1) because the railroad, which makes the obstruction, was not constructed before April 2d, 1873, and (2) because the passage, which the decree in this case will prescribe, does not "enlarge" the duty imposed upon the defendants by section 15 of the Camden and Amboy charter. If there is any possible error in the view above set forth, the fact still remains that the defendants having full power to elect which of three kinds of passages they would construct and keep in repair at the Ridgefield avenue crossing, have for years elected to maintain in the discharge of that duty a passage under their tracks. They could not elect to maintain any passage under, over or across their railroad which was not "good and sufficient" within the meaning of their charter. The decree in this case will merely carry out what must be presumed to have been the election of the defendants and compel the defendants to perform specifically the very duty which they have elected to assume and discharge.

It must, I think, be conceded that counsel for the defendants is correct in his insistment that section 15 of the Camden and Amboy charter can be satisfied only by the maintenance of a passage for Ridgefield avenue *over* the railroad tracks so as to have the roadbed on the same grade as the railway track or at same convenient distance above it. The dictionaries, the decided cases and the verbiage of all the railroad charters and railroad laws which have been passed in New Jersey sustain this conclusion. The word "over," when used to describe or define the relation in space of one object to another, seems to have a definite meaning. *7 New Eng. Dic. 285; Commonwealth* v. *Warwick, 185 Pa. 623; Central Vt. Co.* v. *Royalton, 58 Vt. 234; Illinois Central Railroad Co.* v. *Chicago, 141 Ill. 586, 589, 599; Newbury Port Turnpike Co.* v. *Eastern Railroad Co., 40 Mass. 326, 328; Boston and Maine Railroad Co.* v. *City of Lawrence, 84 Mass. 107, 109.*

The Camden and Amboy charter was the first railroad charter passed in New Jersey, and the only models in this state which the draftsmen of the act had before them were the charters of canal companies where provision was made for bridges and where no underground passages for highways were taken into consideration for manifest reasons. The charters of the West Jersey Railroad and Transportation Company passed the next year after the Camden and Amboy charter (*P. L. 1831 p. 100 § 14*), and of the Delaware and Jobstown Rail or McAdamized Road Company passed in 1833 (*P. L. 1833 p. 80 § 10*), and the supplement to the Camden and Amboy charter passed in 1835 (*P. L. 1835 p. 58 § 2*), seem to exhibit the only other instances in which the word "over" alone is used in the section which deals with passages and bridges for highways. The attention of railroad men must have been very soon called to the fact that oftentimes it was more convenient for the railroad company and for the traveling public to have the passage for the highway constructed through an embankment and underneath the railway tracks. Accordingly, while section 15 of the Camden and Amboy charter was copied over and over again, instead of the word "over," we find the words "under and over," and "under or over," and in the

General Railroad act above quoted, the phraseology is "over, under and across."

If the ingenious argument of counsel for the defendants should be accepted and the bill of complaint in this case should be dismissed, it would seem that a very extraordinary and disastrous consequence to the defendants might thereupon follow. They might be obliged to span the entire highway for the full width at every point which it might be found to have at such a height as to leave the entire easement of travel absolutely unaffected, and thus eliminate the "crossing" or to erect and maintain at great expense the enormous viaduct above referred to.

We now reach the question what at the present day, with the present requirements of public travel along Ridgefield avenue in view, must be the characteristics of a passage under the defendants' railroad which can be deemed "good and sufficient," so that public travel shall not be prevented or impeded. It is hardly necessary to point out that no distinction for the purposes of this case can be drawn between the preventing and impeding of travel. This lofty bank on which these seventeen tracks are constructed absolutely shuts off all travel until a passage of some kind is supplied. It is also unnecessary to speculate as to whether a passage could be deemed good and sufficient which would carry this tide of travel over these seventeen tracks upon the same grade. It may be presumed that the defendants will not urge that the decree should compel the substitution of the sort of a viaduct above described for any passage under the tracks which the decree could prescribe.

The following are the characteristics of the passage which the decree will compel the defendants to "construct and keep in repair:"

(1) The walls must be separated so as to leave thirty-three feet in the clear. No testimony has been taken and no argument has been addressed to the court in regard to the location of the middle line of Ridgefield avenue. As the evidence stands it will be presumed that the middle line is the middle line between the two walls. If such is not the case, or if for any reasons which have not been discussed the defendants may properly leave one wall standing and remove the other the required distance, further

testimony may be taken and the location of the passageway with reference to the centre line of the highway be established before the settlement of the decree.

At this point the reason for limiting the investigation of the width of Ridgefield avenue to what has been referred to as its minimum width may well be considered.

The exact question before the court in this case is not how wide is Ridgefield avenue at this place of crossing; the precise question is how wide a "passage" should the defendants be obliged to provide for use in connection with Ridgefield avenue. If there were grounds for questioning whether or not the defendants are spanning the entire highway so as to leave the public easement of travel unaffected and thus avoid any "crossing" within the meaning of our statute, it would then be necessary to determine the full width of Ridgefield avenue. It seems to me, as I have already intimated, that in such a case the railroad and the highway no more cross each other than when the railroad passes through a tunnel in the solid rock half a mile below the highway. To avoid a "crossing" and intersection or overlapping of easements or rights, the entire highway of course must be spanned. It does not, however, follow that there is no crossing where the railroad spans the entire highway with a stone tunnel a mile long which greatly interferes with the enjoyment of the public easement of travel by cutting off the light and subjecting the traveling public to inconvenience and danger from extraordinary artificial conditions thus created. With such a case, however, we have nothing now to do. The point to be indicated distinctly is that even if Ridgefield avenue was wider than thirty-three feet at the original place of crossing when the railroad was first built, and even if Ridgefield avenue was wider than thirty-three feet in 1885, in that portion where the additional tracks were then laid across it, the conclusion which I have reached is that a "passage" thirty-three feet wide is at present adequate as a substitute for the entire highway for use on the part of the public whatever the width of the highway at any point may be. The *Metuchen Case* here is a guide, and the remarks of Chief-Justice Gummere in relation to the width of the most

crowded streets in New York and Philadelphia may well be referred to.

It should be borne in mind that the duty of the defendants is enlarged from month to month and year to year to meet all changes of conditions. *Central Railroad* v. *State, 32 N. J. Law (3 Vr.) 221.* The court cannot anticipate changes which may or may not occur. The court deals with the duty of the defendants to-day. It is for the defendants to consider whether or not it would be wise and prudent while taking down this immense structure and erecting another in its place to make it somewhat wider than thirty-three feet which width the court under present conditions deems adequate. The laying out of a wider highway, which may be done at any time, will raise a number of questions greatly affecting the liabilities of the defendants to the public which have not been considered in this case. The language of the Camden and Amboy charter is, "where any public or other road shall cross the same;" and the language of section 26 of the General Railroad act is, "where any public or other road, street or avenue now or hereafter laid shall cross the same." Comparing this phraseology with that employed in the charter of the Morris Canal and Banking Company, some of the questions relating to the liability of the defendants in case Ridgefield avenue should be widened will at once appear. See *Morris Canal Co.* v. *State, 24 N. J. Law (4 Zab.) 62; Paterson and Newark Railroad Co.* v. *Newark, 61 N. J. Law (32 Vr.) 80.*

There is no testimony in the cause which will enable the court to specify the height of the passage to be constructed—the headway which must be provided. Perhaps the evidence indicates that a slight increase in the headway either by the elevation of the tracks or the depression of the passage will meet all reasonable requirements. Additional testimony may be taken at the proper time in regard to this matter if it cannot be adjusted by agreement. There probably is a customary height for such passages which will practically control this case.

(2) The defendants must provide light for their passage; they have no right to block up the highway for two hundred and sixty-five feet and then provide for the accommodation of the traveling public a dark tunnel. The authorities of South Amboy

should be relieved from the duty which they have assumed of providing artificial light for this passage. Of course, whether the defendants provide suitable openings which sufficiently let in the daylight or maintain artificial lights may to some extent be left to their option. As the evidence now stands it would seem that the only practicable way of sufficiently lighting the passage is by artificial lights of some sort. This matter, however, may be left open for further suggestions.

(3) The defendants must suitably pave this passage. The case is on all fours in this respect with the *Meluchen Case,* and the decision of the court of errors and appeals is conclusive in regard to the matter. The defendants are required not to pave any portion of the highway, but to provide the passage which they have substituted for the highway with a suitable pavement or floor. No reason, I think, can be suggested why the passage should not be macadamized precisely as Ridgefield avenue is now macadamized.

(4) The defendants must provide for the draining of the water which flows into the passage or by proper means prevent the water from entering the passage. Defendants must also keep the passage free from the accumulation of sand. Many of these duties are summed up in the statement that the defendants must keep their passage in repair.

How far the decree in this case shall exactly define and prescribe in detail the things which the defendants are required to do in the specific performance of their statutory duty may be determined upon the settlement of the decree. It may be that a reference to a master to define accurately the improvements which the defendants are required to make will be found convenient. The defendants may desire to submit plans. If an appeal should be taken, it may be advisable to reserve the determination of details for a further hearing.

4. In addition to the matters hereinbefore considered counsel for the defendants interposes several objections to the granting of any relief to the complainants in this case, the most important of which may be briefly noticed.

It is argued that this action under section 29 of the General Railroad act cannot be maintained because no notice had been

given to the defendants requiring them to construct and repair this passage or crossing. No such defence is raised in the answer, and if it had been, it is not sustained by the correct grammatical construction of section 29, and is also excluded by the express ruling of Chancellor Magie in the case of *Newark* v. *Erie Railroad Co., 72 N. J. Eq. (2 Buch.) 447.*

It is also argued that the board of chosen freeholders of the county of Middlesex are misjoined as a party complainant. This objection is not raised in the answer, and being a mere technicality, not in the slightest degree affecting the administration of justice in this case, would not be entertained if it had any weight. In my opinion, the joinder of the county with the borough, under the circumstances of this case, is not open to objection by the defendants. The county by reason of its duties with respect to the paving of the highway has a concurrent interest with the borough in the ascertainment and the compulsory specific performance of the defendants' duties with respect to this crossing. The decree in this case makes some things of great importance to the county authorities *res adjudicata* as between them, the borough and the defendant railroad companies. While section 29 provides a new equity suit in favor of the "township or municipality," wherein the crossing in question is located, there is nothing in the statute which indicates that the suit thus to be brought is not to be governed in respect to the parties to it by the well-settled rules of equity practice and procedure. The county of Middlesex, under these well-settled rules, was, in my judgment, certainly a proper party, and perhaps even a necessary party, and plainly should be aligned as a party complainant rather than as a party defendant.