# Edison Electric Illuminating Co. *v.* Citizens Electric Company, Appellant.

*Corporations—Electric light companies—Conflicting rights—Maintenance of wires—Interference of wires.*

1. As between electrical companies exercising similar franchises upon the same streets priority carries superiority of right.

2. The subsequent licensee is under the duty to so construct and maintain its wires and lines as not to interfere with the right of the prior occupant of the streets to properly maintain and operate its lines and to transact the business it is authorized by its franchise to transact.

3. Equity will enjoin all interference of junior companies with senior companies which is not strictly unavoidable, and this without regard to the extra cost of the methods which might be necessary for the junior company to use to prevent such interference.

4. The company having the prior right upon the street is entitled to as much space therein as is reasonably necessary for the safe and successful operation of its line, including any additional space that it may be reasonably anticipated will become necessary in the future for the growth and enlargement of its business.

5. There is no right, without the consent of the other party, in one electric light company to attach in any way its wires to the poles of another electric light company, or to attach the wires of another electric light company to its own poles.

Argued Feb. 12, 1912. Appeals, Nos. 212 and 213, Jan. T., 1911, by defendant from decree of C. P. Lycoming Co., June T., 1909, Nos. 4 and 5, on bills in equity in case of Edison Electric Illuminating Company of Williamsport and Lycoming Electric Company v. Citizens Electric Company. Before FELL, C. J., BROWN, MESTREZAT, POTTER and ELKIN, JJ. Affirmed.

Bills in equity for injunctions.

HART, P. J., filed the following opinion:

The questions involved are not only of importance to the plaintiff and defendant, as affecting their relative rights, but as affecting the safety of persons and prop-

erty liable to come in contact with electric currents used by these respective parties.

That a system of high tension wires, carrying a voltage varying from five thousand to one hundred and ten volts, requires the highest degree of care and skill, both in construction and maintenance, to safeguard against injury to persons and property, is undisputed.

To accomplish this is by no means an easy task when but a single system of wiring is maintained upon a street or highway, but when two or more separate systems are maintained upon the same street or highway the danger becomes multiplied by conditions which do not exist in the maintenance of a single system.

In standard pole line construction poles are planted in the ground about six feet deep, varying in height from thirty-five to fifty-five feet above the surface of the ground, supplied with cross arms bolted to the pole at a distance of about eighteen inches apart, provided with wooden pins and glass insulators, placed from twelve to eighteen inches apart. The poles are placed about one hundred and twenty feet apart, and from pole to pole are strung copper wires stretched to a uniform tension and securely fastened to glass insulators. This is called a span. The number of cross arms depends upon the number of wires necessary for present or reasonably contemplated future service and use.

It will be observed that a system thus constructed has its wires held firmly in place upon the cross arms, and when, from any cause, the pole moves from a perpendicular line either way the wires all move together. For example, if the poles should from any reason be caused to lean from a perpendicular towards each other this would cause slack in the wires and this increased slack would be uniform and the wires would not thereby become closer together, and the same would be the result should the pole from any cause become deflected or caused to lean from a perpendicular to one side or the other. All

the wires in the span would move together and maintain their relative fixed distance apart.

It has been demonstrated by the uncontradicted, evidence that in the best of pole line construction no pole will maintain its perpendicular or other position in which it is set. Climatic conditions, freezing and thawing of the earth in which the pole is planted, wind, rain, sleet and snow, heat and cold, all have their tendency to cause the pole to vary from its original position and thereby correspondingly change the position of all the wires in the span supported by such pole causing a greater or less sag in the wires, or causing them to be moved farther to one side or the other.

In this connection it has been demonstrated by mathematical calculation that in a span one hundred feet in length the deflection of a pole at the top a distance of three inches towards the other pole in the span will increase the sag eighteen inches; and that six inches of deflection will increase the sag thirty-four inches, over an original sag of twenty-four inches.

This tendency in pole line construction, of poles to change their position from a perpendicular line, or from their original position, is one of the conditions that must be guarded against and provided for in the maintenance of two or more electric pole line constructions on the same street or highway.

[It has been shown by the preponderance of evidence in this case that safe pole line construction requires a clearance between wires of two or more different or independent constructions of at least twenty-four inches, and that this clearance is observed in the maintenance of such constructions in all cases where due regard is had for the safety of life and property.]

It has been fully established by the evidence that where a high tension electric wire comes in contact with another wire there is no insulation in use that will prevent these wires from sooner or later becoming charged with a deadly current and result in either car-

rying such high current to service wires supplying dwelling houses or other buildings and places using electricity and cause injury to persons and property therein, or in the burning of the wires in contact entirely off, causing them to drop into the street and thereby cause injury or death to the passer-by coming in contact therewith.

[It is further well established that high tension wires coming in contact with a wooden pole or cross arm when wet, or when saturated with moisture, that the moist or wet wood becomes a conductor of electricity and a means of causing fire at the place of contact, and sooner or later of the conveyance of the current to any wire coming in contact with such pole or cross arm.]

It therefore becomes apparent that by reason of the impossibility of keeping poles in an exact given place, as we have indicated, any separate pole line construction maintained upon the same street, with another such construction, should be required to be so maintained as to avoid contact, or the danger of contact, by avoiding the interlacing of wires, or the close proximity of wires, or the construction of poles or cross arms in dangerous proximity to the wires of another or independent pole line construction.

The plaintiff, the Edison Electric Illuminating Company, was incorporated in 1882, and since the year 1884, under permission granted by ordinance of the city of Williamsport, has occupied certain streets and alleys in said city with its poles, cross arms, wires and necessary appliances for the supplying of light, heat and power by means of electricity to persons and corporations desiring to use the same within said city and vicinity, and has been down to the present and still is so supplying the same.

The defendant, the Citizens Electric Company, was chartered under the laws of the commonwealth of Pennsylvania and by ordinances of March 3, 1896, and March 18, 1907, was granted permission to occupy the streets, lanes and alleys of the city of Williamsport with poles

and wires, and has erected poles, wires, cross arms and other appliances in certain of the streets and alleys of the city for the purpose of furnishing light and power by means of electricity to persons and corporations desiring the same and is yet so supplying the same.

The plaintiff charges the defendant with having so constructed and maintained its poles and wires as to rest upon the wires, poles and other appliances of the plaintiff, and also so as to be in dangerous proximity to the wires of the plaintiff, and, in places, through and between the wires of the plaintiff, thereby endangering the property of plaintiff and the lives of plaintiff's customers, employees and of all other persons who may come in contact with or use electric current from works of plaintiff, thereby causing irreparable injury and damage to the plaintiff.

This is denied by the defendant in its answer to the plaintiff's bill of complaint.

The evidence shows that plaintiff and defendant both occupy, in many places throughout the city of Williamsport, the same streets and alleys; the plaintiff company having erected its poles and wires on these streets and alleys several years prior to the defendant company entering upon such streets and alleys with its wires.

[The evidence shows that at eleven different places the poles, wires or cross arms of the defendant company come in contact with the wires of plaintiff company and were in this situation at or immediately before the filing of plaintiff's bill. That at fourteen different places the defendant's wires or cross arms were then maintained within a distance varying from one inch to fourteen inches from the wires of the plaintiff company.

From what we have said this condition is attended with danger to both persons and property.]

The relative duty of the owners and operators of independent pole line constructions on the same streets and alleys have been definitely defined by the Supreme Court in Edison Electric Light & Power Company v.

Merchants & Manufacturers Electric Light, Heat & Power Company, 200 Pa. 209, wherein Justice MITCHELL says: "As between two corporations exercising similar franchises on the same streets, priority carries superiority of right. Equity will adjust the conflicting interests as far as possible and control both so that each company may exercise its own franchise as fully as is compatible with the necessary exercise of the other's. But if interference and limitation of one or the other are unavoidable, the latter must give way." * * * "Equity will enjoin not only wanton or negligent damage, but all interference which is not strictly unavoidable; and in regard to keeping defendant's wires clear of those in bona fide use by the plaintiff and necessary for its business, the injunction must be absolute without regard to extra cost of other methods."

We are fully convinced that the plaintiff having been first on the ground with its construction, antedating the defendant's construction by several years, is entitled to a reasonably safe clearance for its construction, and that no interference, dangerous to the life or safety of individuals or property, can be insisted upon within the scope of legal authority.

[We are further convinced that some approximately safe rule should prevail governing clearances in the pole line constructions of plaintiff and defendant. And in view of the weight and preponderance of the evidence bearing upon that subject, we are fully convinced that a clearance of not less than twenty-four inches should be maintained, and that such is absolutely necessary for the safety of the employees and property of the plaintiff, and for the safety of the lives and property of all others using electric currents or who are liable to come in contact with the same.]

The defendant has filed a cross bill, in addition to its answer to plaintiff's bill of complaint, in which complaint is made that plaintiff company is operated and managed by the same management as that controlling

and managing the Lycoming Electric Company, and that both companies maintain separate pole line constructions and are supplied with electricity from the same electric plant. That they were originally competitors for business and had up to 1889 been operated under separate and independent management and control.

The evidence shows that these companies are distinct corporations and preserve their distinct corporate entity. That whilst they have the same officers, receive their electrical supply from the same plant, yet are separate and distinct in the exercise of their corporate rights and transact their business separate and distinct from each other.

That each company supplies a different class of currents of electricity from the other, and maintains distinct and separate systems of poles and wires, the same as originally built and operated, except as to such extensions, additions and alterations as the necessities of the business of each company required; and that the maintenance of both systems separate and distinct is necessary in conducting and supplying the different currents of electricity carried and supplied by them respectively, and that both construction and systems were so maintained when the defendant company first constructed its poles and wires upon the streets occupied by either.

We are unable to find in the evidence anything that would warrant the conclusion that there was an unlawful combination of these companies, or that either company has transcended its lawful authority in the maintenance of its separate pole and wires upon the streets of the city of Williamsport.

It is also complained and charged by the defendant that the plaintiff, at the time of filing the cross bill, maintained its pole line construction, cross arms, and poles so decayed as to be unsafe and liable to cause injury to the employees and property of defendant, by breaking or falling and thereby coming in contact with the pole line construction of the defendant.

In this connection the evidence does show that there were maintained some such poles and cross arms, which, by reason of age and exposure to the elements, had become decayed and should be replaced with other safe and suitable poles and cross arms where the same has not already been done by the plaintiff.

It is also complained by the defendant in its cross bill that the plaintiff maintains in its construction copper wires which are not insulated and others upon which the insulation is defective. In reference thereto it is shown that at the time of the original construction of the plaintiff's system insulated wires were little, if at all, in common use, and that in all reconstruction work or repair work the latest approved insulated wires are used by it, and have been since the adoption of insulated wires in electric pole line construction.

It is further contended by the plaintiff that neither insulation nor the want of insulation furnishes justification on the part of the defendant in allowing its construction to come in contact or in dangerously close proximity to the wires and construction of the plaintiff.

The evidence shows that under certain conditions the best quality of insulation in use will lessen the immediate danger from contact, but that such insulation will not insulate or prevent injury from contact under all circumstances; that contact continued for a longer or shorter period will wear off the insulation; that moisture will to a large extent cause electric current to pass through the insulation. That high tension wires with a voltage above three thousand will melt and destroy the best insulation when the wire is wet, and that much less voltage will melt and destroy the most insulation in common use.

In dealing with this subject we are but considering that which affects and concerns the defendant in the issue here joined, and are not called upon to say that the want of insulation or of more perfect insulation might

or might not form the basis of complaint by one who, from no negligence of his own, sustains injury from contact with such wires. For the purposes of this issue we assume and cannot otherwise than assume under the evidence that all electric wires, charged with a high voltage, are dangerous to life and property, whether insulated or not, and that the only way to prevent injury to life or property therefrom is to prevent contact that would lead dangerous currents to unprotected persons or property.

It is also complained in defendant's cross bill that in localities where the plaintiff has reconstructed its poles and wires on streets occupied by it, and where the defendant has constructed its poles and wires, that due regard has not been paid in the occupancy of space to the situation and needs of the defendant as they had existed before such reconstruction and so as to avoid contact or dangerous proximity, and without due regard to the future growth and expansion of the defendant's construction.

[The plaintiff having been first on the ground with its construction is entitled to all the space needed for the maintenance of its construction, not alone for its immediate present needs, but for reasonable anticipated growth and expansion of the business of the company plaintiff.

There has been considerable evidence introduced upon this subject, but we are not convinced that this complaint is sustained by the evidence. There are places where more cross arms are in place than present needs require, but we are convinced that this applies to all pole line constructions, and that it is the universal custom and practice to make provision for additional lines by the placing of cross arms beyond present needs, and we fail to find in the evidence that such custom has been abused either by the plaintiff or defendant in their constructions.]

[The place where the greater dispute arises in this

connection is at the notheast corner of Third and Hepburn streets, where twenty double cross arms are maintained by plaintiff on a single pole, giving room for one hundred and sixty wires. The main wires of the plaintiff leading from their plant, not far distant, reach this pole and forms the main distributing point for wires running north, east and west through the city, and whilst not all the pins on all the cross arms are in present use, yet taking into view its location and the positive evidence on the part of the plaintiff, as well as all the evidence presented, it seems well established that; considering the past growth of the business of the company, there is no greater provision made for future use and needs at this distributing point than is reasonably required; and inasmuch as it has not been shown that any of this space so used and occupied had been previously occupied by the defendant company, or that any conditions there existed, by reason of this construction, which could excuse either contact or dangerous proximity of the construction of the defendant company, either now or in the future, we would not be justified in ordering a change in the construction as here maintained by the plaintiff.]

There is complaint made of the maintenance by the plaintiff of an iron guard arm at Edwin and Hepburn streets. This arm, we are convinced, should be removed, as it is unnecessary for any purpose whatever. A wooden guard arm would answer all its possible purposes and be less dangerous to life and property.

[There are numerous points of contact and of dangerous proximity, which we will not mention in detail, charged against the defendant's pole line construction, some of which have, either in whole or in part, been remedied since plaintiff's bill has been filed and during the progress of the taking of testimony, but suffice it to say that we have carefully examined the evidence relating to all such points of contact and dangerous prox-

imity of wires and have based our conclusions of fact upon such evidence.]

[In conclusion we wish to say that the twenty-four-inch clearance which we have found from the evidence to be necessary in electric pole line construction and the order and decree which we make in reference thereto, we intend shall apply to all interferences of the defendant's construction with the plaintiff's construction, so far as such interference relates to the constructions of the plaintiff which were prior in time to the constructions of the defendant, and that in all constructions, where defendant's construction is or may be prior in time to plaintiff's construction, the same rule of twenty-four inches clearance shall be observed by the plaintiff in its construction, our purpose being that this rule shall be equally binding upon both plaintiff and defendant in their pole line construction.]

### CONCLUSIONS OF LAW.

First: As between electrical companies exercising similar franchises upon the same streets priority carries superiority of right.

Second: The subsequent licensee is under the duty to so construct and maintain its wires and lines as not to interfere with the right of the prior occupant of the streets to properly maintain and operate its lines and to transact the business it is authorized by its franchise to transact.

Third: Equity will enjoin all interference of junior companies with senior companies which is not strictly unavoidable, and this without regard to the extra cost of the methods which might be necessary for the junior company to use to prevent such interference.

Fourth: The company having the prior right upon the street is entitled to as much space therein as is reasonably necessary for the safe and successful operation of its line, including any additional space that it may be

reasonably anticipated will become necessary in the future for the growth and enlargement of its business.

Fifth: That there is no right, without the consent of the other party, in one electric light company to attach in any way its wires to the poles of another electric light company, or to attach the wires of another electric light company to its own poles.

### DECREE.

And now, December 27th, 1910, this case came on to be heard at this term and was argued by counsel and thereupon, upon consideration thereof, it is ordered, adjudged and decreed, as follows, viz:

First: That the defendant, its officers, agents, servants and employees are enjoined from cutting or removing any of the poles, wires or other appliances of the plaintiff; from placing its poles, wires or other appliances upon any of the poles, wires or other appliances of the plaintiff, from placing its poles, wires and other appliances in close or dangerous proximity to the wires of the plaintiff; from placing or stringing its wires through and between the plantiff's wires, and from in any manner interfering with the poles, wires and other appliances of the plaintiff, or from in any manner placing its poles, wires and appliances so as to injure the property of the plaintiff or the lives or property of the customers of the plaintiff, or those who may come in contact with or use electrical current from the wires of the plaintiff.

Second: The defendant is ordered to remove its wires and cross arms wherever the same may be in contact with, or within twenty-four inches of, the wires of the plaintiff, in such manner that there shall be a clearance between the nearest wire of the plaintiff and the nearest wire of the defendant of not less than twenty-four inches, and that such clearance shall be hereafter maintained at all places in its pole line construction; to remove all

wires running through or between the wires of the plaintiff, or so situated and maintained as to do injury to the property of the plaintiff, or those who may come in. contact with or use electric currents from the wires of the plaintiff.

Third: It is further ordered, adjudged and decreed that the plaintiff is enjoined and restrained, in all cases where the defendant now has, or hereafter shall have, priority in point of time in its pole line construction upon the streets, alleys or highways of the city of Williamsport and vicinity, from doing, or causing to be done, any of the acts or things the said defendant is enjoined and restrained from doing, or causing to be done, in the order and decree here entered against said defendant.

Fourth: It is further ordered, with reference. to such prior constructions of the defendant, that the same clearance of twenty-four inches shall be observed by the plaintiff between its wires and the wires of the defendant as is directed and ordered to be observed by the defendant.

Fifth: It is further ordered that no iron or other metal guard arm be used by either the plaintiff or defendant in their pole line construction, and that such guard arms be composed of wood, or other equally nonconducting material, and that any metal guard arm now in use be removed and be replaced with wood or other equally non-conducting material, and that the plaintiff remove or replace its metal guard arm as now maintained on its pole at Edwin and Hepburn streets in conformity herewith.

Sixth: It is further ordered that all poles and cross arms of plaintiff and defendant, wherever the same have become so far decayed as to endanger the property of the other, shall be removed and replaced with safe and suitable material.

Seventh: It is further ordered that all wires carrying electric current, hereafter strung and put in use in the

pole line construction of either plaintiff or defendant, shall be covered with the latest approved insulaton.

Eighth: It is further ordered that the defendant so change its wires, as now located at the northeast corner of West Fourth and Hepburn streets, as to maintain its higher level and pass over and above the wires of the plaintiff as now maintained.

Ninth: It is ordered that the defendant pay the record costs and that neither party file bills of costs for witnesses or for subpoenaing the same.

*Error assigned* was the decrees of the court.

*Herbert T. Ames* and *N. M. Edwards,* with them *T. H. Hammond,* for appellant.

*Seth T. McCormick* and *Candor & Munson,* for appellees.

PER CURIAM, March 18, 1912:

These cases were heard together in the common pleas and the appeals involve the same questions. The plaintiffs in the bills filed are electric companies having the same officers and receiving their current from the same plant, but are separate and distinct in the exercise of their corporate rights and in the transaction of their business. Each supplies a kind of electric current differing from that supplied by the other and each maintains a distinct system of poles and wire. It is alleged in each bill that the defendant has placed its poles and wires in the city of Williamsport in dangerous and unlawful proximity to the plaintiff's wires and that it threatens to run its poles and wires between the plaintiff's wires and to cut and move its wires and to interfere with the proper operation of its lines. The prayer of each bill is for an injunction restraining the defendant from cutting or removing the plaintiff's poles and wires; from placing its wires on the plaintiff's poles;

from stringing its wires between the plaintiff's wires or in close or dangerous proximity thereto and to require the removal of poles and wires that interfere with and injure the plaintiff's property and endanger the lives and property of its customers and for "such other equitable relief as may seem meet in the premises."

The defendant in these bills filed cross bills in which it complained of interference with its lines by the defendants in the cross bills and prayed the court, "To adjust the conflicting interests between the said Edison Electric Illuminating Company of Williamsport, Pa., and Lycoming Electric Company, defendants in this cross bill, and the said Citizens Electric Company in the occupancy of the streets, lanes and alleys of the city of Williamsport, as far as possible, and to control all, so that each company may exercise its own franchises as fully as is compatible with the necessary exercise of the other's and so as not unnecessarily to interfere with the other's rights in the premises." Thus the whole subject of dispute was brought before the court. An examination of the parts of the testimony to which our attention has been directed has not convinced us that any error was made in the findings of fact; there is certainly none that would warrant our setting aside any of the findings.

We find no merit in the assignments that the decrees are not pursuant to the allegations of the bills nor in conformity to the prayers thereof. Every phase of the controversy was brought before the court either by distinct allegations of particular acts of interference or by general allegations of encroachment and by the prayers of the cross bills the court was asked to adjust the conflicting interest of the three companies and to control all so that each might exercise its rights without interference with the rights of the others. This is what the appellant asked for and what the court did by its decree. The parts of the decrees forbidding the placing of the defendant's wires "through and between" the

plaintiff's wires and requiring their removal where so placed should not be understood as an absolute prohibition but a prohibition within the distance of twenty-four inches of the plaintiff's lines as now constructed, with an allowance of space for reasonable anticipated growth and expansion.

The facts found and the conclusions of law thereon are admirably stated in the very clear opinion of the learned judge on which we affirm the decree.

The decree in each case is affirmed at the cost of the appellant.