Philadelphia Electric Co. *v*. Philadelphia,
Appellant.

292

Argued April 21, 1930. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*Augustus Trask Ashton,* City Solicitor, and *Ernest Lowengrund,* Assistant City Solicitor, with them *John B. Gest* and *G. Coe Farrier,* Assistant City Solicitors, for appellant.—Appellee is bound by its agreement to abide by the regulations of the board of highway super-visors which require it to relocate its facilities at its own expense whenever such relocation is made necessary by the laying of water or gas pipes, sewers or any other municipal work.

The regulation here in question was not unreasonable, was a condition precedent, and was within the authority of the city to require: Phila. v. Ry., 143 Pa. 444; Keystone Tel. Co. v. Ry., 56 Pa. Superior Ct. 384.

The Philadelphia Electric Company had no right to lay conduits in the streets without the consent of the city: School Dist. of Freeport Boro. v. Gas Co., 18 Pa. Superior Ct. 73, 78; Phila. Co. v. Boro., 167 Pa. 279, 286; Mechanicsburg Boro. v. Gray, 61 Pa. Superior Ct. 95, 102.

As a logical result of this, the city could annex such conditions as it saw fit to the granting of its consent and otherwise the requirement of consent would be an unnecessary formality: United Lighting Co. v. Pub. Ser. Com., 84 Pa. Superior Ct. 24, 30; Allegheny City v. Gas & Pipeage Co., 172 Pa. 632, 635; Sandy Lake Boro. v. Gas Co., 16 Pa. Superior Ct. 234, 241; Cochranton Boro. v. Telephone Co., 41 Pa. Superior Ct. 146, 153; West Chester v. Cable Co., 227 Pa. 384; Valley Ry. v. Boro., 265 Pa. 222; Swarthmore v. Traction Co., 280 Pa. 79.

The Philadelphia Electric Company, appellee, is bound by its agreement irrespective of whether it is reasonable or not, and cannot raise this question at this late date.

The authority of the board of highway supervisors to require the condition agreed to by the Philadelphia Electric Company in the present case is sustained by the ordinances of 1884, 1886 and 1902.

Appellee is estopped from raising any question of ultra vires by acceptance of benefits and by its failure to raise question of authority in limine: Wrightsville Hardware Co. v. McElroy, 254 Pa. 422; Wright v. Pipe Line Co., 101 Pa. 204; Sandy Lake Boro. v. Gas Co., 16 Pa. Superior Ct. 234.

*Francis B. Bracken,* with him *W. James MacIntosh,* for appellee.—The city possessed no inherent right through any municipal control of the streets, to interfere with the maintenance and use of its wires and conduits by the electric company, appellee, in connection with the building of a subway railway: Com. v. Transit

Co., 287 Pa. 70; Electric Light Co. v. Light Co., 200 Pa. 209; Los Angeles v. Gas Co., 251 U. S. 32; Edison Electric Co. v. Electric Co., 235 Pa. 492.

No ordinance or regulations of any municipal body made pursuant to ordinances falling within the scope of the consent ordinance of December 26, 1902, can be invoked as justifying the interference with appellee's wires and conduits in connection with subway construction.

There might be some question if the regulation were an attempted exercise of the city's police power; but when it is conceded to be a regulation as construed by the city to accomplish a purely business object of the city, acting in its capacity as a private corporation, at the expense of another utility company having equal rights under the law, its unreasonableness becomes too apparent for discussion: Valley Rys. v. Harrisburg, 280 Pa. 385; Johnstown Tel. Co. v. Ferndale, 47 Pa. Superior Ct. 461; Minneapolis v. Ry., 215 U. S. 417; Detroit v. Ry., 184 U. S. 368.

OPINION BY MR. JUSTICE FRAZER, June 21, 1930:

In the course of extensive excavations, commenced in 1924, attendant upon the construction of a municipal subway under Broad Street in the City of Philadelphia, it became necessary to shift and relocate underground electrical conduits, placed in that street and owned by plaintiff company. Requests were made, in September, 1925, by the proper city authorities, to the company to make such necessary relocations, and in December the city served written notice on the company "to remove said conduits and appurtenant facilities, so as to permit the execution of the city's project." In reply, the company denied the right of the municipality to compel relocation of the conduits, "at the cost and expense of the company," and assumed "the position......that the encroachment upon its rights heretofore granted, to construct and maintain these conduits, for purposes of subway construction, without proceeding according to law,

and providing compensation to this company for the loss and expense thereby occasioned, imposes a liability on the city for such loss and expense"; however to avoid interruption of its service to customers, "this company has performed the work under protest, and will hold the city responsible for the cost and expense to which it has thus been improperly and unlawfully subjected." The city having denied liability, the company sued in trespass, to determine the question whether or not plaintiff was obliged to remove and relay the conduits in question at its own expense. By agreement of the parties, the case was tried without a jury. The court filed findings of fact and conclusions of law, holding the municipality liable and entered judgment against it for the sum of $6,261.66. Exceptions to the findings were dismissed and final judgment entered for the amount of the claim, with interest. This appeal by the city is from the judgment so entered.

It is conceded that plaintiff company is a public service corporation, chartered under the laws of this Commonwealth, that it has for a number of years supplied the public in the City of Philadelphia with electric lighting, that for such purpose it has constructed and operated apparatus in and upon Broad Street, as well as other thoroughfares throughout the municipality, and through conduits and wires beneath the street's surface, and that it obtained its rights and privileges to enter upon and use the streets of the city, with its consent, as required by the Constitution of Pennsylvania and the provisions of the Act of May 8, 1889, P. L. 136, supplemental to the Act of April 29, 1874, P. L. 73. Nor is it disputed that the grant of the franchise and the conditions imposed by the municipality and its formal acceptance by the company constitute a contract.

Plaintiff company's contention, as set forth in its statement of claim, is that the municipality, "without warrant of law, arbitrarily appropriated said property of the plaintiff, and deprived plaintiff of its franchises

and rights respecting the maintenance and use of said conduits and wires therein contained, in the location where they had been lawfully placed as aforesaid, and that said arbitrary appropriation was for the sole purpose of constructing transit facilities under said Broad Street."

A short presentation will be helpful here of the substance of the material ordinances, rules and regulations adopted by the city council and the departments, having supervision of the streets, granting and governing the entry upon and use of the highways by plaintiff for its designated purposes and the formal acceptance of these ordinances and rules and regulations by the company previous to such entry upon and use of the streets in the construction and operation of its electric lighting plant. At the time the charter of plaintiff company was granted in 1902, there was in existence and in full force and effect an ordinance adopted by council in 1886, providing, among other things, that "every company, corporation, etc., desiring to lay and construct a line or lines of telegraph,......electric light wires ......conduits......under any of the streets of the city shall first file with the board of highway supervisors an application in writing, accompanied by a general plan and specification, showing the location of the proposed work"; and that the laying, construction and maintenance of all wires, conduits, etc., shall be under the rules and regulations of the board of highway supervisors. In 1906, four years before the company's entry and use of the streets and its first application for permission to do so, definite rules and regulations were adopted and continued in force by the board of highway supervisors, "governing applications for the laying of electrical conduits, tubes and manholes"; wherein, section 2 stipulated that, "Before any street surface shall be broken, or a permit be issued (except as hereinafter provided), the following rules and regulations, and such additional rules and regulations as the board of highway super-

visors may from time to time adopt, shall be binding on the applicant or applicants"; that "any modification of existing structures found to be necessary must be made by or under the direction of the bureau concerned and at the expense of the party having the permit"; and it was further provided in section 12, "If, in the laying of water or gas pipes, sewers, or any other municipal work, it shall become necessary to change the location of any of the conduits, manholes, or other structures, they shall be shifted or altered at the cost or expense of the owners, to such places as shall be directed by the board of highway supervisors."

Subsequent to the incorporation of plaintiff company, the city council adopted a "consenting ordinance," granting permission to plaintiff to enter upon and use the streets of Philadelphia and the construction and operation, among other things, of underground conduits. The ordinance also provided that "the board of highway supervisors shall locate said conduits, wires ......and all such work shall be done under the direction of the electrical bureau of the department of public safety"; and it further required from the company a bond in the sum of $50,000, "conditioned that the company shall faithfully comply with the provisions of this ordinance, as well as other ordinances, regulating the construction, maintenance and extension of electrical conduits, poles, wires, and lines and license charges thereon, in the City of Philadelphia." Following the enactment of the above mentioned ordinance, the company furnished the required bond, in which was recited all provisions of the consenting ordinance of 1902, and the further obligation that "the said company shall and will fully and faithfully comply with all the provisions" of the ordinance of 1902, "as well as all other ordinances of council of said city regulating the construction, maintenance and extension of electrical conduits,......in the City of Philadelphia."

Plaintiff filed its written acceptance, obligating it "to accept and agree to be governed by the ordinances of councils, and the rules and regulations of the board of highway supervisors and such additional rules and regulations as the board shall hereafter make." Plaintiff company made written applications in 1901, 1914 and 1916 for permission to open streets and lay conduits. To one of the applications, that of 1914, and presumably to all, were annexed plaintiff's formal acceptance of the ordinances and rules and regulations mentioned above.

The right of plaintiff to enter upon Broad Street and lay its conduits beneath the surface rests, accordingly, upon contract, subject however to the police power of the city and its rights under its charter which continued its full control and supervisions over all its thoroughfares. The chief sphere of the action of the police power, being a function of government, concerns immediately a restriction on the use of property or the conduct of persons that may be detrimental to public health, morals or safety: White's App., 287 Pa. 259, 263. We need not go further than to say, in relation to the nature of this contract, that it was a contract for service; and the contractual conditions imposed by the city, which plaintiff could either accept or reject, were impositions certainly within the scope of its municipal powers. The record of the case discloses that the company had every opportunity to know, in detail, before its formal acceptance, all requirements exacted by the city and the evidence indicates its familiarity with all prerequisites imposed by the city. Consequently, when plaintiff seeks to repudiate the contractual requirement that "if, in the laying of water or gas pipes, or sewers, *or any other municipal work,* it shall become necessary to change the location of any conduits, manholes, or other structures, they shall be shifted and altered at the cost or expenses of the owners, and relaid at such places as shall be directed by the board of highway supervisors," it unquestionably can therein find no just grounds for repudiation. When

the occasion arose and necessity required the moving
and replacing of the conduits, and plaintiff, in the face
of its contract with the municipality, refused to comply
with the city's request, a situation was created threaten-
ing the convenience and safety of the people and one
which the city could meet only by exercising its rights
in behalf of the public welfare in requiring the obstruct-
ing conduits to be shifted. The city, however, was mind-
ful of the rights of the company when it set forth the
stipulation as to shifting and replacing. No such work
could be performed at the expense of plaintiff except
when "it shall become necessary." The city had entered
upon the construction, at great expense, of a most ex-
tensive subway improvement in one of its prominent
thoroughfares. In the course of construction of this
municipal enterprise it was found that conduits of plain-
tiff, as then located, hindered and prevented the proper
completion of the project, intended for public use. The
shifting and relaying of the structures was a matter of
pressing and immediate public concern. Hindrance and
delay in the construction by reason of the location of
plaintiff's property meant not only increased cost to the
city, but also a serious public inconvenience and that
such continued incompletion, or an improper comple-
tion, would unquestionably amount to nothing less than
jeopardy to public safety. Before these imposing public
necessities, private rights may not stand as a barrier;
and in the present instance the conduits were subject to
the regulatory control of the municipality under its po-
lice power (Springfield Con. Water Co. v. Phila.,. 285
Pa. 172, 175; Pittsburgh v. Gas Co., 34 Pa. Superior Ct.
374) and by its acceptance of the provisions of the ordi-
nances and rules and regulations governing its right to
enter upon and use the streets, plaintiff was obligated to
defray the cost of moving and relaying its conduits and
other property in accordance with the principle set forth
in many declarations of this court: Allegheny v. Mill-
ville, Etna & Sharpsburg Street Railway Co., 159 Pa.

411; Davis v. Gray, 16 Wall. 231. This court has repeatedly held that if a public service corporation accepts imposed municipal conditions in consideration of the right given to construct its works, it must perform as stipulated or suffer the penalty arising from failure to do so. The kind and range of the conditions imposed by the municipality were within the discretion of its executive and administrative officers, and it has long been an established principle of law that the court, except in cases of manifest abuse of discretion, will not substitute its judgment for that of the body to whom the parties committed the right of imposing conditions (Carlisle v. M. St. Ry. Co.'s App., 245 Pa. 561; Cameron v. Carbondale, 227 Pa. 473); and the conditions exacted, and which plaintiff accepted, were such as the city deemed proper: Allegheny City v. Peoples' N. Gas & Pipeage Co., 172 Pa. 632; Allegheny v. Millville, etc., Ry., supra.

The learned court below declares that the authority vested in the board of highway supervisors "does not extend to so great a matter as the shifting of a whole system of electrical apparatus." The board was a functioning part of the municipal government, invested with power and authority to perform and carry out its designated functions and duties as such. Plaintiff obligated itself to conform to the city's necessities and the board was precisely that part of the municipal government whose lawful duty it was to see that requirements were fulfilled by the electric company. It was never intended, as was said in Phila. v. Ry. Co., 143 Pa. 444, 471, to transfer the duty of determining these matters, or any of them, from municipal authorities to others.

The learned court below was in error in holding that the city ordered shifting "of a whole system of electrical apparatus." The conduits beneath Broad Street can be considered only as a part of the general system by which plaintiff supplies electrical light, heat and power, to the people of Philadelphia City and County. Plaintiff ac-

cordingly was not obliged to go, and did not go, to the trouble and expense of shifting its miles of conduits extending beneath many streets, other than Broad Street. The franchise, and not the particular location, is the essence of the contract, and the city under its power to regulate might compel, for instance, a railway company to remove its tracks from the center to the side, or from the side to the center of the street: Grand Trunk Western Ry. v. South Bend, 227 U. S. 544, 553. The business of the corporation must here be considered as a whole, and the cost of shifting its appliances laid in Broad Street is imposed upon only a part: Puget Sound Traction Co. v. Reynolds, 244 U. S. 574.

Plaintiff in its statement of claim avers that "the defendant, in manner aforesaid and without warrant of law, arbitrarily appropriated said property of plaintiff," and the court below, in its opinion holding the city liable, says that "since it is clear that the defendant has not compensated or expressed a willingness to make compensation to the plaintiff for the results of its interference with latter's property rights, its interference cannot be justified under the right of eminent domain, and consequently amounts to a trespass." The court below bases that conclusion upon its interpretation of the provisions of the Act of June 17, 1913, P. L. 520, by which authority was given the municipality of Philadelphia, as a city of the first class, to construct the subway in question here. An examination of that act reveals that it does not apply to and therefore does not control the present dispute. The act provides that a city of the first class may "purchase, lease, locate, construct and equip, or otherwise acquire, transit facilities, and to own......and operate the same." By the provisions of section 6 the municipality is empowered to resort to the exercise of the right of eminent domain to acquire such private property, "as shall be necessary," and the payment of compensatory damages. But the learned court below quite misconstrues the meaning and

intent of the act, with reference to the present controversy, in saying: "The Act of 1913, under which the defendant is constructing the underground railway, to make way for which its officers caused the shifting of the plaintiff's conduits, provides for the assessment of damages for property taken thereunder, and thus indicated that the taking of such property is not by virtue of the police power." In the case before us there was no taking or appropriating of property. The conduits were not removed from Broad Street by the city, nor destroyed or demolished. In their original position they rested upon property of the municipality, in which the company had no proprietary rights or interests whatever. They were merely shifted to another and near-by location in the same street and remained upon the city's property. It is true, the Act of 1913 makes specific provisions with reference to the removal and relocation of underground conduits, of the character here in question. The provisions apply to a situation entirely different from that which exists here. Section 6 of the act sets forth in terms the exact purposes for which the city shall exercise its right of eminent domain. It may take and appropriate, under that right, lands for the construction and operation of transit facilities, such as may be necessary for the relocation of existing railway tracks and for the removal and relocation of "any pipes, sewers, underground conduits, when such things interfere with the construction and operation of the facilities of transit"; and "including also, such lands and rights and interests therein, as shall be necessary for the purpose of disposing of earth, stone, or other material excavated in the construction of such transit facilities." That is to say, when private property for the designated various purposes is required it may be taken by right of eminent domain. But what land, other than already owned by the municipality, was needed here for the relocation of plaintiff's conduits? Upon what other property were they to be shifted and relaid? Certainly not upon any

additional land purchased, or acquired in any manner, or to be so purchased or acquired, by the city. The appliances in their original position rested upon municipal property; when shifted and relaid they still remained on city property. Subject to the paramount authority of the Commonwealth, the regulation and control of the streets, which are the great highways of the city, belong to the city government (Southwark R. R. Co. v. City of Phila., 47 Pa. 314, 321; Springfield Con. Water Co. v. Phila., supra); and a regulation enacted for the public safety under the police power is not a taking without just compensation of private property or of private property affected with a public interest: Chicago, Burlington, etc., R. R. v. Chicago, 166 U. S. 226, 255. The precise question here involved was met in the case of New Orleans Gas Light Co. v. Drainage Commission of New Orleans, 197 U. S. 453. The gas company was given the exclusive privilege to supply gas to the city and laid underground pipes and conduits in the streets. Later the municipality adopted a general system of drainage, and in the construction of the scheme found it necessary to remove and change the location of the gas conduits and pipes. The company claimed an arbitrary taking by the city, without just compensation. The court in denying the claim of the corporation, so clearly sets forth the legal principles which governed there, and equally control here, that we may quote and adopt them as stated: "There is nothing in the grant of the privilege which gave the company the right to any particular location in the streets; it had the right to use the streets, or such of them as it might require, in the prosecution of its business...... Except that the privilege was conferred to use the streets in laying the pipes in some places thereunder, there was nothing in the terms of the grant to indicate the intention of the State to give up its control of the public streets, certainly not so far as such power might be required by proper regulations to con-

trol their use for legitimate purposes connected with the public health and safety...... The gas company by its grant from the city acquired no exclusive right to the location of its pipes in the streets as chosen by it, under a general grant of authority to use the streets. The city made no contract that the gas company should not be disturbed in the locations therein." In Keystone Telephone Co. v. P. & R. Ry. Co., 56 Pa. Superior Ct. 384, the stipulation involved in the present case whereby the plaintiff here was required, and agreed, to shift and relay its conduits under Broad Street at its own expense, was considered. In that case the City of Philadelphia changed the street grade to enable the tracks of a railroad company to be elevated, which necessitated a relocation of the telephone company's underground conduits. In affirming the judgment of the court below for the city, the appellate court said: "The shifting of the conduits was decided upon by the city authorities, and these were removed and replaced under the direction and supervision of the board of highway supervisors of the city...... The resultant changes were necessary to enable the telephone company to continue its business, and these were reasonably in contemplation, by the provisions that they shall be shifted and altered at the expense of the owners, to such places as shall be directed."

In the present case plaintiff's conduits were removed and relaid at its expense in accordance with its contract with the city, a contract concluded previous to the entry upon and use of the streets by the company. There was no appropriation or destruction of its property. The shifting and relaying were upon the land of the municipality and were plainly necessary for the public welfare. It has long been an established doctrine that a city cannot be required to compensate the plaintiff for obeying lawful regulations enacted for the safety of the lives and the property of the citizens: New Orleans Public Service, Inc., v. New Orleans, 281 U. S. 682.

For the reasons set forth in the foregoing opinion the judgment of the court below must be reversed and judgment entered for defendant.

DISSENTING OPINION BY MR. JUSTICE KEPHART, October 7, 1930:

This appeal is from a proceeding brought in the nature of a test case. The amount stated does not reflect the actual damage, nor is the appellee the sole party aggrieved. All utilities occupying many miles along Broad and other streets are affected by the municipal action here complained of. The electric company alone has over one hundred miles of conduits which have been or will be affected by subway construction in the City of Philadelphia, completed, in process, or in immediate contemplation. The damage to these conduits coupled with the expense necessary to their repair, reconstruction, relocation and maintenance will run into millions of dollars.

The city, pursuant to the Act of June 11, 1913, P. L. 520, empowering it to build transit facilities, adopted the ordinance of April 8, 1924, authorizing building a subway in Broad Street, on which were to be operated electric trains for the accommodation of the public. Though not material, the local traction company has been operating the subway since its completion. When the city began the work of building the subway, various public service companies were already in Broad Street, engaged in the business of selling their product or the use of their facilities to the public. Among these were the electric company (the appellees), which supplies light to the city and its people, telephone companies, and others. One of appellee's main trunk lines was located in Broad Street and from it other lines extended into other intersecting highways. Acting under the above mentioned Act of 1913 and ordinance of 1924, the city directed these operations to be removed from their existing locations to make way for the subway. The com-

pany protested the removal order, which involved the destruction of extensive sections of its conduit system without being compensated for the expense connected with it; later, by arrangement and to avoid delaying the work, the conduits were demolished by the city's contractor and subsequently removed and rebuilt by the electric company at its own expense. This action followed to determine liability for this removal. The court below held that the electric company should be compensated, but this court on appeal reversed that judgment. I disagree with the latter's conclusion.

The majority hold that the city may lawfully proceed as it has done under its police power, though, in the course of the opinion, the question of police power is interwoven with that of contract.

Police power, as a function of government, operates as a restriction on the use of property or the conduct of persons where such use or conduct is detrimental to *public health, morals* or *safety* (White's App., 287 Pa. 259, 263), and it must clearly appear that there is resultant benefit to health, morals or safety of the public before use of the police power will be sustained.

The city, if claiming the right to remove conduits under the police power, cannot find the authority in any of the ordinances cited in the majority opinion, and referred to hereafter, nor in any other ordinance prior to that of 1924. The ordinance of 1924 directed the construction of an underground railway and expressly provided for the revocation of all permits for structures interfering with the railway. If an underground railway is a governmental activity, then uncompensated obedience to such exertion of the police power cannot result in the taking of property without due process of law: New Orleans Pub. Ser., Inc., v. City of New Orleans, 281 U. S. 682, 687. Such was the exercise in New Orleans Gas & Light Co. v. Drainage Commission of New Orleans, 197 U. S. 453, for the city's drainage system. But the instant case is not of this quality.

Building and operating a subway is purely a business enterprise engaged in by the city in its proprietary capacity (In re Board of Rapid Transit Railway Commissions of City of New York, 197 N. Y. 81); and this court so stated when considering the Subway Act in Com. v. P. R. T., 287 Pa. 70, 72. A sharp line has been drawn between business enterprises and purely governmental activities in relation to the police power. The two are fundamentally different. What could justify the use of the police power in compelling the removal of the conduits? The conduits were ordered moved to make way for the subway; they were moved so that another business of no higher public aspect could function. There is nothing to show that their original position in any way imperiled or their new position would benefit the life, health, property or safety of the public. This is made clear in City of Los Angeles v. Los Angeles Gas & Elec. Corp., 251 U. S. 32, 38, 39, in which the court said: "In what way the public peace or health or safety was imperiled by the lighting system of the corporation or relieved by its removal or change......is certainly not apparent...... The court reasoned and concluded that what the city did was done not in its governmental capacity,—an exertion of the police power,—but in its 'proprietary or quasi-private capacity' and that therefore the city was subordinated in right to the corporation, the latter being an earlier and lawful occupant of the field."

Business enterprises stand on equal ground before the law, and, in business relations as distinguished from governmental, a municipality is held to the same standard that the law prescribes for private corporations. When the municipality acts for its private advantage to obtain a profit, the object of private corporations, it is not acting in its governmental capacity as a sovereign, but in its proprietary capacity as a private corporation: In re Board of Rapid Transit Railway Commissioners of City of New York, supra. See also Western Saving

Fund Society v. City of Phila., 31 Pa. 175, and cases hereinafter cited. To favor one business as against another would be to invade a substantive property right. Such discrimination is guarded against by the Fourteenth Amendment: City of Los Angeles v. Los Angeles Gas & Elec. Corp., supra. See also Com. v. P. R. T., supra; Bailey v. Phila., 184 Pa. 594; Edison E. I. Co. v. Citizens E. Co., 235 Pa. 492; Edison Elec., etc., Co. v. Merchants', etc., Co., 200 Pa. 209, 219; In re Board of Rapid Transit Railway Commissioners of City of New York, supra; Scibilia v. Phila., 279 Pa. 549. The city has conceded this position.

The city may, however, exercise its police power over a utility occupying a street, whereby another company may acquire a place in the highway; but this can be done only by the company, in whose favor the right is declared, paying to the company on the ground any damage the latter may sustain by such exercise; otherwise the act is confiscatory. The fact that the city did not drive the company out of business but provided another place for its conduits is immaterial; the specific wrong here complained of was the monetary damage entailed in the destruction or moving of the conduits. That is the light company's position in this case. It is quite clear to my mind that any acts performed under authority of the ordinance of 1924 or the Act of 1913 cannot be justified as an exercise of the police power in the light of the subject-matter here involved. If any other right exists to move the conduits, we must find it through an examination of the contract as embodied in the consent and other ordinances, or under the eminent domain power provided in the Subway Act. The majority opinion states that the conduits were not removed from Broad Street nor destroyed or demolished. The record clearly shows (Record, page 92a) that the conduits involved in this action were destroyed by the city's contractor and subsequently rebuilt and relocated by the appellee.

The city takes the position that the light company was under contract to remove its facilities, at the latter's own expense, to make way for the subway when the city required it to do so. The authority of the utility comes from the Act of May 8, 1889, P. L. 136. In 1902, the electric company requested the city to grant its consent to their occupation of the streets of Philadelphia; this franchise was granted in the ordinance of 1902 with the stipulation that a bond should be furnished conditioned for the compliance with that ordinance and all "other ordinances regulating the construction, maintenance and extension of electrical conduits." The provisions of the ordinance of 1886, consistent with that of 1902, formed a part of appellee's rights and obligations. That latter ordinance regulated the manner and method under which companies, securing the city's consent, could enter its highways by placing in them their conduits, pipe lines, and like equipment. Section 4 of the 1886 ordinance reads: "The laying, construction and maintenance of all......conduits......shall be under the supervision of......the electrical department...... and *shall be laid* under the rules and regulations of the Board of Highway Supervisors." That board was created and their duties defined by the ordinance of 1884 for the purpose of preventing frequent and unnecessary opening of street pavements. In this ordinance the board was authorized and empowered "to prescribe ......such......rules......governing the *time* and *manner* in which all street excavations shall be made and the *time* and *method* of repairing the same."

The record shows that under these ordinances appellee filed its bond on January 17, 1903 (Record, page 69a), and immediately commenced the furnishing of electrical service to the City of Philadelphia by taking over the operation of the existing electrical system, formerly carried on through the medium of a number of small independent companies which were consolidated into the Philadelphia Electric Company. These facts

are not only established in the record (Record, pages 73a, 74a, 69a), they are matters of common knowledge. There seems to be no justification for the statement of the majority that entry by the appellee was not made until 1910; the permit taken out in that year was merely an administrative permit granting the electric company the right to open a particular section of the surface of Broad Street, as an incident to the extension of a small section of the entire electric system. The permit so indicates. Once the primary franchise contract has been fixed by acceptance and the institution of service thereunder, extensions or replacements may not be made the basis for imposing additional restrictions, affecting the entire system or any section thereof. This principle was clearly stated in Russell v. Sebastian, 233 U. S. 195, 206, 207, where the court, in speaking of a similar situation with regard to a water company franchise, said: "There is no ambiguity as to the scope of the offer. It was not simply of a privilege to maintain pipes actually laid, but to lay pipes so far as they might be required in order to effect an adequate distribution. The privilege was defined as that 'of using the public streets and thoroughfares thereof, and of laying down pipes and conduits therein, and connections therewith, so far as may be necessary for introducing into and supplying such city and its inhabitants either with gas light, or other illuminating light, or with fresh water for domestic and all other purposes, upon the condition that the municipal government shall have the right to regulate the charges thereof.' "

"The breadth of the offer was commensurate with the requirements of the undertaking which was invited. ...... Such a grant would not be one of several distinct and separate franchises. When accepted and acted upon it would become binding, not foot by foot, as pipes were laid, but as an entirety, in accordance with its purpose and express language": Grand Trunk Ry. Co. v. South Bend, 227 U. S. 544, 555, 556.

The import of all these municipal conditions affecting the primary franchise contract concerned administrative rules as to "the time, manner" and possibly the methods under which the "construction, maintenance and extension......of conduits" was to be carried on. In what sense could an ordinance authorizing the building of a subway be considered as a rule regulating the construction, maintenance or extension of an electrical conduit?

These ordinances did not confer legislative powers on the board of highway supervisors, which would permit it to prohibit companies (having authority from city council to do so) from entering the highways or to establish rules in derogation of grants given by council so as to convert absolute rights into revocable licenses, or to oust such companies from the highways after they had lawfully entered thereon.

Furthermore, the board was powerless to make administrative laws beyond the scope of the ordinances creating it and defining its powers. The legislative power of a city is lodged in council by act of assembly; it cannot be delegated by the municipality to another body. Certainly the above mentioned ordinances did not contemplate a general ouster for business or proprietary purposes, affecting many miles of conduit system.

Acting under supposed authority, the board adopted rules of the board of highway supervisors, section 12, of which reads: "If in the laying of water or gas pipes, sewers or other municipal work, it shall be necessary to change the location of any conduits......they shall be shifted......at the cost of the owner." This section, as construed by the majority, would, if here effective, repeal the franchise right granted by the city to this appellee. It would have the effect of converting a property right (subject to a condition fulfilled) into a mere license. Its passage was not only a purely legislative act but the board was without authority, in any of the ordinances mentioned, to make it. When appellee secured

its charter from the State, the consent of the city to occupy its streets, and the actual occupation thereof, it acquired a substantive property right therein (Russell v. Sebastian, supra; Boise Water Co. v. Boise City, 230 U. S. 84, 90, 91; Louisville v. Cumberland Telephone Co., 224 U. S. 649, 663, 664) ; which could not be withdrawn, altered or modified: Russell v. Sebastian, supra; Hestonville, Mantua & Fairmount Passenger R. R. Co. v. City of Phila., 89 Pa. 210; Grand Trunk Ry. Co. v. South Bend, supra.

The limit of authority in the board was confined to jurisdiction over ordinary cases of street openings or occasional shifting of conduits or pipes. The city at the time of the adoption of section 12 in 1906, or prior thereto, did not have the power to engage in building subways, nor could it move the conduits for that purpose. The effect of the term used in section 12 must be related to, and limited by, the character of work contemplated by these enabling ordinances of 1884, 1886 and 1902. Section 12 states that in the "laying of......other municipal work" the utility must shift to some other place as directed by the board. This must be read in connection with section 5, which requires that a utility already occupying a city street shall be compensated when the shift is made for the benefit of another utility. It is the clear intent of the regulations taken as a whole that as between utility enterprises, priority of position in the streets should carry with it priority of right, and that any expenses incidental to the entrance into the streets of a later utility project, should be borne by that project rather than imposed upon prior occupants. This principle should be borne in mind in interpreting the phrase "municipal work" as used in section 12, and since under that section the cost of making way for municipal projects is imposed upon the occupants of the street for the benefit of the municipality without regard to priority, in order to make this section consistent with the earlier section and with the general scheme of responsibility

contemplated by the regulations, it must be interpreted to apply to strictly governmental activities of the municipality, as distinguished from its private or proprietary enterprises. Then section 12 must be interpreted as being authorized and limited by the ordinance relating to the "time" and "manner" of "opening" streets. An ordinance authorizing an underground railway to be built can scarcely be considered as one referring to the time, manner and method of placing a conduit or as "laying a municipal work," even if it be considered as municipal work. The city did not so regard it since it proceeded under the ordinance of 1924 to attempt revocation of appellee's permits. That ordinance is provided for the building of an underground electric railway, a business venture, and, as incidental to the building, took hold of plaintiff's conduits and, in effect, destroyed them. It compelled the electric company to build new conduits and relay them in a new location,—clearly a matter not authorized either by the ordinances of 1886 and 1902 or section 12. No one of them contemplated a situation like the present, permitting one business corporation to force, without compensation, another business corporation to remove and rebuild its equipment for the benefit of a newcomer in the field.

It is argued that the signing, by the company's officer, of an application for a permit to open streets constituted a binding acceptance of the rules of the board, and a modification of the basic franchise contract. But such paper could not and did not affect the substantive right granted by the city,—in fact, no authority from the company, authorizing such release is pleaded, and, further, such acceptance should be limited, as stated above, by the powers of the board and the ordinary work to which the rule, section 12, related and to reasonable regulations as authorized by the ordinances of 1884, 1886 and 1902. It may be seriously doubted whether, even with the corporate sanction, a charter right could be contracted away, without consideration, in this manner.

The electric company having secured its franchise, a permit to open a street for the purpose of exercising the rights granted by the franchise was an administrative duty of the board, and if it refused consent, except upon reasonable conditions, the electric company would have been entitled to demand such permit as a matter of right: Dillon on Municipal Corporations, 6th ed., section 1273. The foregoing principle has also been approved by this court: Com. v. Warwick, 185 Pa. 623.

The company by the permit received nothing thereby to which it was not already entitled, and, furthermore, it cannot be made the basis of an estoppel since there is no loss or detriment to the city.

"Municipal" as used in section 12, related to governmental work, and any other construction on which to ground the city's act in behalf of a business company would illustrate the total lack of adequate authority in appellee to occupy streets, and expend its many millions. It would be a mere licensee subject to be defeated by any business enterprise authorized by the city.

The company was bound by such administrative rules as the board had power to make and no further: Valley Rys. v. Harrisburg, 280 Pa. 385, 396; City of Minneapolis v. Minneapolis Street Ry. Co., 215 U. S. 417. Section 12, is, in my judgment, unreasonable and works a deprivation of property rights contrary to the Fourteenth Amendment: Russell v. Sebastian, supra; Atlantic Coast Line v. Goldsboro, 232 U. S. 548. It subordinates one business enterprise to another. The board had no power to make such a rule.

It was necessary for the city to go to the legislature for the power to build this subway; this was done in 1913. The power was given under certain limitations. These are found in the Act of 1913 which provides, as I view it, for compensation in cases like the present. But the city now ignores this act in endeavoring to establish its right to remove appellee's conduits, claiming the right under the ordinances and rule mentioned. But it;

cannot separate its powers from the purpose for which they are invoked. At no time did it possess an unlimited right to remove. The city is a creature of the State and even if it had the power it claims, the legislature may modify that power and its uses. The power to remove as claimed by the city and the Act of 1913 authorizing the specific purpose of "building subways" must be considered together; when this is done, it becomes evident that appellee should be compensated for its damages. Section 6 of the Act of 1913 gives the city power to purchase property, such lands, franchises, and so forth, as shall be necessary for the construction of transit facilities, including as well lands, rights, "pipes ......underground conduits" and so forth. Section 7 provides that if they cannot agree on damages to be paid, the city may tender its bond, covering the damages that may be assessed later.

Under the circumstances, and for the further reasons here expressed, I think that the judgment of the court below was clearly right and I would affirm.